IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

TROY BANISTER,           )
                          )
          *Plaintiff,*     )
                          )   No. 06 CV 5759
    *-vs-*              )
                          )   *(Judge Darrah)*
OFFICER CRAIG BURTON, et al.,   )
                          )
        *Defendants.*   )

## PLAINTIFF'S MOTION IN LIMINE
## TO BAR EXPERT TESTIMONY

Plaintiff, by counsel, moves the Court to preclude defendants from offering opinion testimony from Dr. Don Fishman, Forensic Scientist Kelly Ashton Hand, and Forensic Scientist Mandi Hornickel.

### I.   The Witnesses and Their Opinions

#### A. Dr. Don Fishman

Dr. Don Fishman is a trauma surgeon who attended to plaintiff at the Christ Hospital emergency room on January 13, 2006. Fishman should be limited to testifying about his observations and treatment of plaintiff.

Defendant Burton will testify that plaintiff fell to the ground after Burton had fired the 13 bullets in his gun. Burton will also testify that while on the ground, plaintiff tossed a handgun over his head, and that the firearm ended up about 40 feet to the north.

Defendants have given notice (Plaintiff's Exhibit 1, attached) that they will seek to elicit from Dr. Fishman the following opinions:

1. That plaintiff "could have thrown the handgun with his right hand and that, medically speaking, there was nothing that would prevent Plaintiff from doing so." (Exhibit 1 at 1.)

2. That plaintiff "could have crawled after being shot, and that medically speaking, there was nothing that would prevent Plaintiff from doing so." (Exhibit 1 at 1.)

3. "How long it would take for Plaintiff to be fully recovered from his injuries." (Exhibit 1 at 1.)

4. "The path of the bullets that entered Plaintiff." (Exhibit 1 at 2.)

### B. Kelly Ashton Hand

Ms. Hand is employed by the Illinois State Police as a "forensic biologist" and a "forensic DNA analyst." Ms. Hand uses DNA analysis to render opinions about blood, semen, and saliva. Ms. Hand was unable to find plaintiff's DNA on the handgun recovered from the scene.

Plaintiff expects defendants to offer Ms. Hand's opinion that as permitted at the criminal trial, that "it is possible for someone to

handle a firearm with their hand and not leave sufficient DNA on that firearm to test it."

### C.  Mandi Hornickel

Mandi Hornickel is a fingerprint examiner employed by the Illinois State Police crime lab. Ms. Hornickel was unable to find any suitable latent impressions on the handgun recovered from the scene.

Plaintiff expects defendants to offer Ms. Hornickel's opinion that "it is possible to touch an object and not leave fingerprints on the object."

## II.    Defendants' Expert Disclosures

Defendants have not submitted reports from any of their proposed expert witnesses. Defendants' expert disclosures consist of the three page document attached to this motion as Exhibit 1.

## III.    The Court Should Bar Dr. Fishman's Speculations

Defendants seek to offer Dr. Fishman's opinions that plaintiff "could have thrown the handgun [40 feet] with his right hand" and that plaintiff "could have crawled after being shot." The Court should bar these speculations.

The Court of Appeals has made plain that an expert's testimony must be confined to his (or her) particular field. In *Wilson v. City of*

*Chicago,* 6 F.3d 1233 (7th Cir. 1993), the Seventh Circuit considered whether a pathologist should be permitted to offer an opinion about the "effects of electroshock treatments on the human body or psyche." *Id.* at 1239. The Court held that the opinion testimony had been properly excluded because the expert "failed to show that he has the requisite medical or scientific knowledge" about the effects of electroshock treatments. *Id.*

Dr. Fishman does not claim to have any special knowledge about throwing or crawling ability. He is a trauma surgeon, who is skilled in treating persons who have had some type of external force applied to their body. He does not purport to be an expert in biomechanics or throwing or crawling ability.

Dr. Fishman admitted at his deposition that he could not offer an opinion about how far plaintiff could had thrown an object, and that his opinion was limited to whether "from an anatomic and physiologic standpoint … [there was anything] that would preclude him [plaintiff] from throwing an object." (Exhibit 2 at 95:10:12, Fishman Dep. 95:10-12.) This opinion falls short of that proposed by defendants, i.e., whether plaintiff could have thrown a handgun 40 feet while on the ground.

-4-

Dr. Fishman's admission leaves no doubt that he lacks the "requisite experience" to offer opinions about throwing or crawling ability. The Court should bar his opinions on these issues. *Wintz By and Through Wintz v. Northrop Corp.*, 110 F.3d 508, 513-14 (7th Cir. 1997); *Cunningham v. Masterwear Corp.,* 569 F.3d 673, 674-75 (7th Cir. 2009).

### IV.    The Court Should Bar Dr. Fishman's Opinions about Prognosis

Defendants seek to elicit from Dr. Fishman his opinion about how long it took Plaintiff to fully recover from his injuries. Defendants, however, will not offer any evidence that plaintiff has fully recovered: Dr. Fishman has not examined plaintiff since 2006 (Exhibit 2 at 97:16-17, Fishman Dep. 97:16-17) and defendants have never requested that plaintiff submit to an examination under Rule 35 of the Federal Rules of Civil Procedure. Plaintiff will present testimony from Dr. George Branovacki, the orthopedic surgeon who treated plaintiff in 2006 and who examined plaintiff in 2009, that plaintiff "will be able to do most activities but live with residual left hip and knee discomfort and a small limp and be constantly reminded of his injury." (Exhibit 3 at 10041.)

In addition to being based on pure speculation (rather than a current examination), any opinion from Dr. Fishman about prognosis should have been disclosed in a Rule 26(a)(2)(B) report. While Dr. Fishman, as a treating physician, can testify about plaintiff's injuries and the treatment plaintiff received, *Musser v. Gentiva Health Services*, 356 F.3d 751, 756-57 (7th Cir. 2004), any testimony about "prognosis or the future impact of the injury" should require an expert's report. *Krischel v. Hennessy,* 533 F.Suppp.2d 790 (N.D.Ill. 2008).

## V.    The Court Should Bar Dr. Fishman's Opinions about the Path of the Bullets that Entered Plaintiff

Defendants assert that they intend to offer opinion testimony from Dr. Fishman about the path of the bullets that entered plaintiff. The Court should not permit any such opinion testimony.

Dr. Fishman admitted at his deposition that he could not determine which of the ten bullet holes he saw on plaintiff's body were entrance wounds and which were exit wounds. (Exhibit 2 at 85:14-24, Fishman Dep. 85:14-24.) Dr. Fishman made plain at his deposition that "I'm not a ballistics expert and not a pathologist," and that a trauma surgeon should not "be saying something is an entrance and something is an exit." (Exhibit 2 at 26:17-22, Fishman Dep. 26:17-22.) Dr.

Fishman should therefore not be permitted to offer any opinion about the path of the bullets in plaintiff's body.

### VI. The Court Should Bar Opinions About Reasons for the Absence of Fingerprints and DNA

Defendants intend to elicit testimony from two employees of the State Police Crime Lab about the possible reasons why DNA and fingerprints were not found on the handgun found at the scene. The Court should bar this testimony for two reasons:

First, defendants have not submitted a Rule 26 report on these opinions, and

Second, neither of the proposed witnesses is qualified to offer any opinion about reasons for not finding DNA and fingerprints.

### A. The Absence of a Rule 26 Report

The general rule is that "expert testimony may not be presented at trial if the expert's report was not disclosed to the other side." *Dura Automotive Systems of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 615 (7th Cir. 2002). The Seventh Circuit has approved a letter from counsel serving as an "expert's report" when the letter set out, *inter alia,* "the expected testimony and the basis for that testimony," *Jenkins v. Bartlett,* 487 F.3d 482, 488 (7th Cir. 2007), and was subsequently

supported by an affidavit signed by the proposed expert. *Id.* The disclosures in this case, as contained in Plaintiff's Exhibit 1, *infra,* identify the expected testimony but do not provide any information about the basis for that testimony.

As to Dr. Fishman, defendants' disclosures consist of the following (Exhibit 1 at 1-2):

> He will also testify as to opinions, including but not limited to his opinion that Plaintiff could have thrown the handgun with his right hand and that, medically speaking, there was nothing that would prevent Plaintiff from doing so. He will also testify as to his opinion that Plaintiff could have crawled after being shot, and that medically speaking, there was nothing that would prevent Plaintiff from doing so. He will also testify as to his opinions regarding how long it would take for Plaintiff to be fully recovered from his injuries. He will also testify as to his opinions based on the medical records and x-rays as to the path of the bullets that entered Plaintiff, and where the bullets were positioned at the time of the x-rays and at the time of his examination of Plaintiff. He will also testify to any and all opinions as testified to in his criminal testimony and deposition testimony. All of the opinions given by Dr. Fishman are to a reasonable degree of medical certainty.

Nowhere in these disclosures is there any indication of the basis for these opinions, an essential requirement of the command of Rule 26(a)(2)(B) that an expert report contain "complete statement of all opinions to be expressed and the *basis and reasons therefor*." (emphasis added)

The disclosures for Kelly Ashton Hand and Mandi Hornickel are similarly deficient. Moreover, these disclosures, set out at pages 2-3 of Plaintiff's 1, do not clearly identify the opinions defendants seek to offer from these witnesses.

## B. The Lack of Qualifications

Kelly Ashton Hand is a "forensic biologist" and a "forensic DNA analyst." Mandi Hornickel is a fingerprint examiner. Neither is a criminal investigator, as in *United States v. Christophe,* 833 F.2d 1296 (9th Cir. 1987), where the Court permitted an FBI agent, who had "spent the last four years investigating 800 to 100 robberies" to testify about why fingerprints had not been found. The credentials of these "forensic scientists" fail to approach those of the expert in *United States v. Glover,* 479 F.3d 511 (7th Cir. 2007), who "was an eighteen year veteran of the Chicago Police Department who had been an evidence technician since 1997. Before becoming an evidence technician, she completed additional training in crime scene processing." *Id.* at 518.

Neither Hand nor Hornickel is qualified to express an opinion for the reason why fingerprints or DNA was not found on the firearm. Accordingly, the Court should prohibit the introduction of any such opinions.

## VII.    Conclusion

For the reasons above stated, the Court should preclude defendants from offering opinion testimony from Dr. Don Fishman, "Forensic Scientist" Kelly Ashton Hand, and "Forensic Scientist" Mandi Hornickel.

Respectfully submitted,


/s/ Kenneth N. Flaxman
Kenneth N. Flaxman
ARDC 830399
200 S Michigan Ave, Ste 1240
Chicago, IL 60604
(312) 427-3200

*an attorney for plaintiff*

**Exhibit 1**

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| TROY BANISTER, | ) | |
| | ) | |
| Plaintiff, | ) | 06 C 5759 |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO and CHICAGO | ) | JUDGE DARRAH |
| POLICE OFFICER CRAIG BURTON | ) | |
| CHICAGO POLICE OFFICER | ) | Magistrate Judge Mason |
| SERGEANT MARC MOORE | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' 26(A)(2) DISCLOSURES

Defendant, City of Chicago, by its attorney, Mara S. Georges, Corporation Counsel for the City of Chicago, and Defendants, Chicago Police Officer Craig Burton and Chicago Police Lieutenant Marc Moore, (referred to collectively herein as "Defendants"), by one of their attorneys, Julia S. Bruce, Assistant Corporation Counsel, and pursuant to Rule 26(a)(2), disclose the following:

**(2)    Disclosure of Expert Testimony**

> **A.    In addition to the disclosures required by paragraph (1), a party shall disclose to other parties the identity of any person who may be used at trial to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence.**

RESPONSE:

1.    Dr. Don Fishman, Christ Hospital, the subject matter being his treatment of Plaintiff in the emergency room on the date of the incident for the injuries he sustained, as well as to all the subject matters as set out in the medical records from Christ Hospital and x-rays taken of Plaintiff at Christ Hospital, and including but not limited to his trial testimony and deposition testimony. He will also testify as to opinions, including but not limited to his opinion that Plaintiff could have thrown the handgun with his right hand and that, medically speaking, there was nothing that would prevent Plaintiff from doing so. He will also testify as to his opinion that Plaintiff could have crawled after being shot, and that medically speaking, there was nothing that would prevent Plaintiff from doing so. He will also testify as to his opinions regarding how long it would take for Plaintiff

to be fully recovered from his injuries. He will also testify as to his opinions based on the medical records and x-rays as to the path of the bullets that entered Plaintiff, and where the bullets were positioned at the time of the x-rays and at the time of his examination of Plaintiff. He will also testify to any and all opinions as testified to in his criminal testimony and deposition testimony. All of the opinions given by Dr. Fishman are to a reasonable degree of medical certainty.

      2.      Forensic Scientist Kelly Ashton Hand, Illinois State Police Crime Lab, 1941 W. Roosevelt Road, Chicago, Illinois, the subject matter being the subject matter being her role in the investigation of the incident subject to this lawsuit, including but not limited to the subject matter contained in all records from the Illinois State Police, Division of Forensic Services, and will testify as to how the findings as set out in those documents were derived. She will testify as to any role she had in the investigation of this shooting, conclusions she made and how she came to such conclusions, including but not limited to the subject matter contained in her criminal trial testimony and deposition testimony. She is expected to give testimony regarding her education, training and professional background. She is expected to give testimony regarding what her duties, assignments and responsibilities were as it related to Plaintiff. She will lay the foundation for all Illinois State Police Reports, Division of Forensic Services, as it relates to this case. She will testify that she examined the firearm that was recovered from the scene. She will testify as to reasons for her examination, what the examination was, the equipment used in the examination, the science involved in the examination and conclusions reached, and the results of the examination. She will also testify as to any and all other tests she performed and the results of those tests. She will testify that all her opinions are based upon a reasonable degree of scientific certainty in her specialty and that her opinions are based on her education, training, experience and the tests she performed and the results of those tests. She will lay the foundation for all the reports she was involved in, and any other report from the Illinois State Police, Division of Forensic Services.

      3.      Forensic Scientist Mandi Hornickel, Illinois State Police Crime Lab, 1941 W. Roosevelt Road, Chicago, Illinois, the subject matter being her role in the investigation of the incident subject to this lawsuit, including but not limited to the subject matter contained in all records from the Illinois State Police, Division of Forensic Services, and will testify as to how the findings as set out in those documents were derived. She will testify as any role she had in the investigation of this shooting, conclusions she made and how she came to such conclusions, including but not limited to the subject matter contained in her criminal trial testimony and deposition testimony. She is expected to give testimony regarding her education, training and professional background. She is expected to give testimony regarding what her duties, assignments and responsibilities were as it related to Plaintiff. She will lay the foundation for all Illinois State Police Reports, Division of Forensic Services, as it relates to this case. She will testify that she examined the firearm that was recovered from the scene. She will testify as to reasons for her examination, what the examination was, the equipment used in the examination, the science involved in the examination and conclusions reached, and the results of the examination. She will also testify as to any and all other tests she performed and the results of those tests. She will testify that all her opinions are based upon a reasonable degree of scientific certainty in her specialty and that her opinions are based on her education, training, experience and the tests she performed and the results of those tests. She will lay the foundation for all the reports she was involved in, and any other

report from the Illinois State Police, Division of Forensic Services.

B.    Except as otherwise stipulated or directed by the court, this disclosure shall, with respect to a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony, be accompanies by a written report prepared and signed by the witness. The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

<u>Response:</u>    See Response to (2)(A).

Respectfully Submitted,

MARA S. GEORGES
Corporation Counsel of the City of Chicago

By:    /s/ *Megan K. McGrath*
Megan K. McGrath
Assistant Corporation Counsel
30 North LaSalle Street, Suite 1020
Chicago, Illinois  60602
(312) 744-9212

Defendants Burton and Moore
By:    /s/ Julia S. Bruce
Julia S. Bruce
Assistant Corporation Counsel
30 North La Salle Street, Suite 1400
Chicago, Illinois 60602
(312) 744-0451

**Exhibit 2**

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION
 3     TROY BANISTER,                    )
                                         )
 4                    Plaintiff,         )
                                         )
 5            vs.                        ) No. 06 C 5759
                                         )
 6     CITY OF CHICAGO and CHICAGO       )
       POLICE OFFICER CRAIG BURTON       )
 7     and CHICAGO POLICE OFFICER        )
       MARC MOORE,                       )
 8                                       )
                      Defendants.        )
 9
10            The deposition of DON ROSS FISHMAN, M.D.,
11     taken pursuant to notice and subpoena, before
12     Marcia Yoshizumi, CSR No. 084-003537, Certified
13     Shorthand Reporter in and for the County of Cook,
14     State of Illinois, at 30 North LaSalle Street,
15     Suite 1400, Chicago, Illinois, on May 20, 2009,
16     commencing at 10:00 o'clock a.m.
17
18         APPEARANCES:
19             STANLEY L. HILL & ASSOCIATES, P.C., by
               MS. DANIELLE N. SMITH and
20             MS. MARGAUX L. STILL
               (651 West Washington Street, Suite 205
21              Chicago, Illinois  60661)
                   appeared on behalf of the plaintiff;
22
23
24
```

Page 2

```
 1        APPEARANCES:  (Cont'd.)
 2              HONORABLE MARA S. GEORGES
                CORPORATION COUNSEL, by
 3              MS. JULIA S. BRUCE and
                MS. MEGAN K. McGRATH
 4              Assistants Corporation Counsel
                (30 North LaSalle Street, Suite 1400
 5               Chicago, Illinois  60602-2402
                   appeared on behalf of the defendants.
 6
 7                    *   *   *   *   *   *   *
 8
                         I N D E X
 9     Witness:                                Page
10        DON ROSS FISHMAN, M.D.
11        Examination by:
12              Ms. Bruce .................... 3
13              Ms. Smith .................... 89
14              Ms. Bruce .................... 100
15              Ms. Smith .................. 107
16              Ms. Bruce .................. 109
17
18                   E X H I B I T S
19     Number                   Marked for Identification
20        1 .................................. 22
21        2 .................................. 53
22        3 .................................. 104
23        4 .................................. 111
24
```

Page 3

```
 1                    (Witness sworn.)

 2               DON ROSS FISHMAN, M.D.

 3    called as a witness herein, having been first duly

 4    sworn, was examined and testified as follows:

 5                    EXAMINATION

 6    BY MS. BRUCE:

 7          Q.    Okay.  Can you please state your name

 8    and spell it for the court reporter.

 9          A.    Don Ross Fishman, F-i-s-h-m-a-n.

10          Q.    Okay.  And this is the deposition of

11    Dr. Fishman, being taken pursuant to notice and

12    pursuant to the applicable rules.

13               My name is Julia Bruce.  We spoke on

14    the phone.  I represent the Chicago police officers

15    and the City of Chicago in this case.

16               And for the record, this is the case

17    of Banister versus Burton, et al., 06 C 5759.

18               Dr. Fishman, have you given a

19    deposition before?

20          A.    I have.

21          Q.    How many times?

22          A.    I'm sorry?

23          Q.    More than once, right?

24          A.    Yeah.  Certainly more than 40 or 50 of
```

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 4

```
 1  them.

 2         Q.    Okay.  And all those depositions

 3  that you've given, have those all been in your

 4  professional capacity as a -- as a doctor?

 5         A.    Yes.

 6         Q.    Okay.  So just a couple of really brief

 7  ground rules then.  Obviously, if you don't

 8  understand one of my questions, just let me know

 9  and I'll rephrase it.  If you don't hear me, let me

10  know and I'll repeat the question.

11              If you can just keep your voice up

12  for the court reporter and make sure all your

13  answers are out loud, she can get everything down

14  that we're saying.  Okay?

15         A.    I understand.

16         Q.    And please, if I cut you off, I don't

17  mean to.  Let me know and I'll let you finish your

18  answer.

19              Did you review anything to prepare

20  for this deposition today?

21         A.    Yes.  I reviewed the medical record

22  of Troy Bannister that was sent to me by you,

23  Ms. Bruce.

24         Q.    Okay.  And did I send you anything else
```

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 5

1  other than the medical record?

2       A.    You sent me just a cover letter and a

3  subpoena.

4       Q.    Okay.  And the medical record that I

5  sent, you -- it looks like you have those in front

6  of you.

7       A.    That's correct.

8       Q.    Okay.  And those are Bates stamped at

9  the bottom, 1 through 157.

10      A.    Correct.

11            And I'm just noticing that you also

12  sent a copy of -- I'm not sure what this is -- a

13  pleading or some --

14      Q.    Oh, it was a copy of your criminal

15  trial testimony in this case.

16      A.    Oh.

17      Q.    So I guess you didn't have a chance to

18  review that, correct?

19      A.    No.  I didn't realize it was there.  I

20  apologize.

21      Q.    That's okay.

22            You do remember, though, testifying

23  in the criminal case, The People v. Troy Banister,

24  06 CR 503?

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 6

1        A.    I don't have an independent recollection

2   of my testimony in the --

3        Q.    Okay.

4        A.    -- criminal charge.

5        Q.    Okay.  That's fine.

6              And other than speaking with me on

7   the phone to discuss scheduling, have you spoken

8   with any other attorneys on this case recently?

9        A.    No, I have not.

10       Q.    Okay.  And you said you don't have an

11  independent recollection of testifying at that

12  criminal trial.

13             Do you remember speaking with the

14  state's attorney regarding this case, the criminal

15  trial?

16       A.    Yeah.  When you sent me the medical

17  record and I looked at the name, it registered that

18  the name was familiar to me --

19       Q.    All right.

20       A.    -- but I couldn't remember exactly why.

21  It was probably because I had testified in the

22  criminal case, but ...

23       Q.    All right.  Would you like to take like

24  five minutes just to read -- to skim through your

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 7

1  testimony?

2      A.    I -- if you'd like me to, I will.  But

3  I don't think it's necessary.

4      Q.    Okay.  Okay.  I just wanted to -- if

5  you need to, just let me know.  Or if I ask you any

6  questions about that and you want to refer to the

7  transcript, that's fine.

8            Okay.  So when you did review the

9  medical records, you said the name sounded familiar

10 to you.

11     A.    Yes.

12     Q.    Do you have an independent recollection

13 of treating Mr. Banister or just based off the

14 record that you reviewed?

15     A.    Just based off the records.

16     Q.    Okay.  Now, you're a physician licensed

17 to practice medicine in the State of Illinois.

18     A.    Yes, I am.

19     Q.    Okay.  How long have you been licensed

20 to practice medicine?

21     A.    I first obtained my license in 1984, so

22 25 years now.

23     Q.    And can you just briefly describe your

24 educational background?

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 8

1       A.    Sure.   Undergraduate was at the

2    University of Michigan; finished in 1979.  I then

3    went to Rush Medical College from 1979 to 1983;

4    graduated in 1983 with my M.D. degree.  From '83 to

5    '88 I did a general surgery residency at Rush-

6    Presbyterian-St. Luke's in Chicago.  And then after

7    that, I went out into practice.

8              The only other education -- formal

9    education I have is I went back in the mid to late

10   '90s and got my M.B.A.  But that really, I don't

11   think, has anything to do with this case.  But

12   that's my educational background, for the most

13   part.

14       Q.    Okay.  And after you finished your

15   residency at Rush, you said you went into practice.

16       A.    Correct.

17       Q.    And where did you start working?

18       A.    I started out at what then was known as

19   Olympia Fields Osteopathic Hospital.

20       Q.    And what is it known as now?

21       A.    St. James Olympia Fields Hospital.

22       Q.    Okay.  And would -- how long did you

23   work there?

24       A.    I was at Olympia Fields for ten years.

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 9

1          Q.    And did you have any specialty while
2    you worked there?
3          A.    I did trauma, critical -- surgical
4    critical care, and then I also did general surgery.
5          Q.    What's the difference between surgical
6    critical care and general surgery?
7          A.    Well, general surgery is actually
8    operative; you have to operate on people.  Surgical
9    critical care is the care of patients who have
10   surgical diseases in the intensive care unit.
11         Q.    Okay.  And then where did you work
12   after you left Olympia Fields?
13         A.    Advocate Christ Medical Center.
14         Q.    Okay.  And that is actually where you
15   were working on January 13th of 2006 when you saw
16   Mr. Banister, right?
17         A.    Correct.
18         Q.    All right.  In what -- in what capacity
19   did you work at Christ Hospital?
20         A.    I was one of the trauma surgeons on the
21   staff of Christ Hospital.  And then eventually --
22   and in 2006 when I saw Mr. Banister, I was the
23   director of the trauma service at that point in
24   time.

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 10

1          Q.     Director of the trauma service?

2          A.     Correct.

3          Q.     And what does that mean?

4          A.     I was the administrative over -- sort

5     of the person responsible for the trauma service

6     from a medical -- from a physician capacity,

7     responsible for administrative work on the trauma --

8     for the trauma service at Christ.

9          Q.     And so you worked in the emergency room

10    there?

11         A.     Not in the emergency room directly.

12    It's sort of a misunderstanding.  As a trauma

13    surgeon, I see my patients -- or I see patients

14    initially, typically, in the emergency room, but I

15    am not an emergency room physician.

16                The way I usually describe it, for

17    instance, is if you came in, let's say, with a

18    heart attack, I would not be the physician who

19    would care for you.

20         Q.     Okay.  And so when you're talking about

21    a trauma surgeon, how is that different from a

22    regular surgeon -- or a general surgeon?

23         A.     Most trauma surgeons have a background

24    as general surgeons.  They have just focused their

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 11

1    practice, for the most part, on the care of

2    patients who are involved in trauma as a mechanism

3    of disease and presentation to the hospital.

4         Q.    Okay.  So when you're talking about a

5    trauma surgeon, you're talking about dealing with

6    patients, such as someone with gunshot wounds --

7         A.    Correct.

8         Q.    -- or other external forces applied to

9    them.

10        A.    Yes.  Very good.  Yes.

11        Q.    Okay.  And then a general surgeon would

12   deal with someone that perhaps had a heart attack

13   or something like that.

14        A.    No.  A general surgeon -- the typical

15   kind of person that a general surgeon would deal

16   with, for the layperson to understand, we say

17   someone with acute appendicitis --

18        Q.    Okay.

19        A.    -- that needs their appendix out or

20   needs their gallbladder removed or their hernia

21   repaired.

22              As I said, most all the trauma

23   surgeons that I know of work -- went through and

24   trained as general surgeons and then they went on

Page 12

```
 1   to specialize --

 2          Q.     Okay.

 3          A.     -- in trauma surgery.

 4          Q.     Okay.  And you were also trained to

 5   operate on these patients, correct?

 6          A.     Yes.

 7          Q.     Okay.  And ...

 8          A.     And let me just clarify that.

 9          Q.     Uh-huh.

10          A.     I was trained to operate on these

11   patients, but not all areas of the body and not all

12   operations.  There are certainly areas or injuries

13   that require operations that are outside my area of

14   expertise that I then obtain subspecialty care to

15   do those operations.

16          Q.     Okay.  So what types of operations were

17   you qualified to do?

18          A.     Pretty much anything in the belly, most

19   work in the chest, vascular injuries throughout the

20   body.  The areas that typically I don't do would be

21   orthopedics, or bones, and then brains.

22          Q.     Now, as of January of 2006, how long

23   had you been working at Christ?

24          A.     I started there in October of 1998, so
```

Page 13

1    eight years; just about eight years.

2         Q.    And did you work then as a -- I guess a

3    trauma surgeon the whole time?

4         A.    Yes.

5         Q.    Is that the right way to refer to you?

6         A.    That would be correct.

7         Q.    Okay.  And that's -- so if a person

8    came through the -- through Christ Hospital, they'd

9    come into the emergency room.  And would you

10   initially be the one to see them in the emergency

11   room?

12        A.    Yes.  Let me just describe how it would

13   happen.

14        Q.    Okay.

15        A.    Typically what would happen is the

16   hospital would receive a call from the paramedics,

17   or through what's called a "base station" for the

18   paramedics.  It might be another hospital the

19   paramedics contacted first.  We would be notified

20   that the paramedics were bringing a patient in that

21   had been involved in some type traumatic incident.

22   And the page would go out to the staff on the

23   trauma service at the time to gather in the

24   emergency room to receive the patient once the

Page 14

1    patient arrived.

2                    And then they would be evaluated by

3    what was called the "trauma team" on call for that

4    day, which would include residents, both in the

5    surgical training area and also emergency room

6    training area, and then also ancillary personnel

7    such as respiratory therapy, nurses, X-ray

8    technicians.  Security would typically be there.

9         Q.    Okay.  Would you be there as well, or

10   would this team first assess the individual before

11   you saw him?

12        A.    Depending on the time of day and what

13   else was going on in the hospital, it's possible

14   that one of the attending trauma surgeons, myself,

15   and the other people that were the attendings might

16   be in the emergency room or they might not.

17        Q.    Okay.  When a patient comes through --

18   comes into Christ, what is the normal -- what is

19   the first thing that's done as far as assessing the

20   patient?

21        A.    For a trauma patient, it's pretty

22   standardized.  What's first done is what's known

23   as a "primary survey."  And what that involves is

24   evaluating for immediately life-threatening

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 15

1    injuries, what we call the ABCs, airway, breathing,

2    circulation.  And that is done initially, as I

3    said, to rule out any immediate life-threatening

4    injuries.

5         Q.    Okay.  And after that primary assessment

6    is done, if you're able to rule out the life-

7    threatening injuries, then what's the next step?

8         A.    The next step is a secondary assessment,

9    which is a head-to-toe evaluation of the patient

10   looking for injuries that are present, and any

11   potentially life-threatening injuries and other

12   injuries that may not be life threatening, but that

13   need to be dealt with.  So simultaneously, other

14   things are occurring, such as I.V.s have been put

15   in, the patient's clothes are stripped off of him

16   or her, blood is drawn.

17        Q.    Okay.  And does that secondary survey

18   include a whole physical exam of the patient then?

19        A.    Yes.  It should be a head-to-toe

20   assessment checking the patient's complete body.

21        Q.    Okay.  Now, at some point, are -- is

22   the team or someone getting a medical history from

23   the patient, asking the patient questions if

24   they're -- if they're conscious and awake.  Is that

Page 16

1    being done as well?

2        A.    Yes.

3        Q.    Okay.  During the primary survey,

4    secondary survey?

5        A.    Sort of simultaneously while it's going

6    on.  Part of the evaluation -- of the primary

7    survey is evaluation of the patient's airway and

8    breathing, and one of the ways to do that is just

9    ask the patient questions and see if the individual

10   can respond appropriately, if they can talk.

11       Q.    And is there -- and then after that

12   secondary survey is done, what's the next step?

13       A.    The next step would be diagnostic

14   tests, again to -- once you've identified areas of

15   potential injury, if you want to -- if you can't

16   determine exactly whether or not an injury is

17   present or how severe it is, then you need to do --

18   to delve further into the area to determine whether

19   or not an injury is present.  So the next step

20   would be diagnostic tests, such as radiologic

21   imaging.

22       Q.    Okay.  So like X-rays and things like

23   that?

24       A.    Correct.

Page 17

1    Q.    Okay.  Anything else that's done other

2  than what you just described as far as the normal

3  procedures when a trauma patient comes in?

4    A.    No.  That's -- as I said, simultaneously

5  there are other things going on, such as oxygen

6  being put on the patient, blood being drawn, I.V.s

7  being started.  You know, that's pretty much the

8  standardized approach to the trauma patient.

9    Q.    And then at some point, is it -- is

10  there a determination made whether or not surgery

11  needs to be done or an operation or anything like

12  that?

13    A.    Yes.  Again, once -- so you've gone

14  through your primary and secondary survey.  You've

15  done your diagnostic tests.  Hopefully, at that

16  point in time, you've determined what the injuries

17  are that are present.  Then you can formulate a

18  plan as to how to deal with those injuries, whether

19  the patient might need surgery, might not need

20  surgery.  If they do need surgery, do they need

21  immediate surgery, can it be sort of delayed for a

22  day or so?

23            That -- those are the decisions that

24  need to be made.  You know, where is the patient?

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 18

1    Can the patient be sent home?  Do they need to be

2    admitted to the hospital?  If they need to be

3    admitted to the hospital, where in the hospital do

4    they need to be admitted to?  Is it a regular

5    general medical bed, or do they need to go to an

6    intensive care unit?

7         Q.    Okay.  Okay.  And then you just kind of

8    go from there with each specific patient, right?

9         A.    That's correct.

10         Q.    Okay.  Any other normal procedures that

11    are done when a trauma patient comes in that we

12    haven't discussed?

13         A.    Yeah.  Just routine information is

14    obtained from them.  As you stated before, a

15    history is obtained from them, events surrounding

16    the incident might be obtained.  Patients get

17    registered for the hospital, and you try and get

18    information regarding where they live, that type of

19    thing, just for clerical information.

20         Q.    Okay.  Now, some of these examinations

21    that you've just discussed are done by other

22    members of the staff at the hospital, correct?

23         A.    Yes.

24         Q.    What are things that you would normally

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 19

 1    do yourself?

 2         A.    Actually, in the trauma -- on the

 3    trauma service at Christ Hospital, the attendings

 4    actually kind of oversaw and supervised almost --

 5    supervised all the work.  We didn't actually

 6    necessarily perform any of it.  So like the initial

 7    physical -- primary survey, secondary survey was

 8    done by the residents.  And if an attending was

 9    present, he would stand there and just make sure

10    everything was being done the way he thought it

11    should be done.

12         Q.    Okay.

13         A.    Actual -- actually, having me listen

14    to the patient's lungs or something like that,

15    oftentimes didn't get done physically by me unless

16    I had a concern or a question about what the

17    residents were doing --

18         Q.    Um-hmm.

19         A.    -- and what they found.

20         Q.    Okay.  But you were there supervising.

21         A.    Correct.

22         Q.    Okay.  And other than things like that

23    where it's a resident doing something and you're

24    supervising, are there also some things that you

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 20

1    might not be present for, but that would be

2    documented in the medical records for treatment

3    and care?

4         A.    Certainly.

5         Q.    Okay.

6         A.    You know, if the patient looks good,

7    and I don't need necessarily to be present if the

8    patient is what we call "hemodynamically stable,"

9    that blood pressure is okay, the heart rate is

10   okay, the breathing is okay, you know, we have

11   formulated a plan, I might leave the emergency

12   room resuscitation area to go take care of other

13   responsibilities.  And then the tests might get

14   done, and I might get contacted about the results,

15   that type of thing.

16        Q.    Okay.  And again, you have the medical

17   records for Mr. Banister in front of you, right?

18        A.    Yes.

19        Q.    And you've reviewed those before this

20   deposition.

21        A.    Yes.

22              I didn't go through every single

23   page.  I wanted to see what I thought were the

24   pertinent parts of the chart.

Page 21

1       Q.     Okay.  But you've obviously seen

2    medical records similar to these many times, right?

3       A.     Yes.

4       Q.     And as part of your job, you're going

5    to be relying on the examinations and observations

6    of other staff members, correct?

7       A.     Yes.

8       Q.     And assuming that they're accurate.

9       A.     Yes.

10      Q.     And relying on them as far as your

11   treatment and diagnosis goes.

12      A.     Yes.

13      Q.     Okay.  And I guess as far as these

14   medical records go for Mr. Banister, if you could

15   just take a look at the record and -- or if you

16   already have an answer to this, can you tell if a

17   primary survey was done on Mr. Banister?

18      A.     Yes, there was.

19      Q.     Okay.  And is there a specific record

20   that you recall seeing or that you can point to?

21      A.     Let's get to the Bates stamp.  The

22   Bates stamp, page 15.

23      Q.     Okay.

24      A.     It's labeled Christ Hospital Emergency

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 22

1    Record.

2          Q.    Okay.

3          A.    Sort of at the top quarter of the page

4    it lists History and Physical Trauma.  It says,

5    Trauma History, Medical History, Primary Survey.

6          Q.    Okay.

7          MS. SMITH:  Excuse me.  Are you going to mark

8    this as an exhibit?

9          MS. BRUCE:  I will.

10                Yeah, actually why don't we do that.

11   I'm sorry.

12         MS. SMITH:  It's all right.

13         MS. BRUCE:  Can we just mark the entire set

14   of medical records as Group Exhibit 1, Deposition 1.

15                    (Deposition Exhibit No. 1,

16                     Witness Fishman, was marked

17                     for identification 5/20/09.)

18   BY MS. BRUCE:

19         Q.    Okay.  So on page 15 -- no.  And just --

20   just so I'm aware, there's a number of pages that

21   have that same title, Christ Hospital Emergency

22   Record.  It looks like it starts with page 14 and

23   goes through page 18.

24                    Are these all a specific set of

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 23

1   records?  Are these all like the initial assessment,

2   the primary assessment, or --

3        A.    Yes.  What this is, some of it is

4   nursing documentation --

5        Q.    Okay.

6        A.    -- some of it is physician documentation

7   of the evaluation of, in this case, Mr. Banister.

8        Q.    If I could just direct your attention

9   to the page that's Bates stamped 14.

10       A.    Yes.

11       Q.    About a -- a little bit toward the

12   middle, there's a section that says Attending.

13       A.    Correct.

14       Q.    And then in parentheses it says,

15   January 13, '06, 16:38 hours, DF2.  Is that a note

16   that you added to this record?

17       A.    Yes.

18       Q.    Does DF2 stand for something in

19   particular?

20       A.    No.  That was just -- for the computer,

21   that was my code.  So they could identify -- you

22   know, when DF2 came up, they could, you know, sort

23   of determine who was DF2.

24       Q.    Okay.  So when I see DF2, that means

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 24

1    Dr. Fishman.

2         A.    Correct.

3         Q.    Okay.  And then underneath it says,

4    Supervised Case:  I have personally seen and

5    examined this patient.  I have fully participated

6    in the care of this patient.  I have reviewed all

7    pertinent clinical information.  I agree with the

8    management and disposition of this patient.

9         A.    Correct.

10        Q.    Okay.  And that was again, as you

11   indicated earlier, you were supervising other

12   residents that were performing examinations,

13   correct?

14        A.    Correct.  I was -- this indicates

15   that I was present for Mr. Banister's care in the

16   emergency room on January 13th of 2006, and I

17   supervised the treatment -- evaluation and

18   treatment of him.

19        Q.    Okay.  And then going back to page 15,

20   under the section that's labeled Trauma History

21   right under History and Physical Trauma, there are

22   some gunshot wounds noted there.

23        A.    Yes.  What it says is, Trauma History:

24   Penetrating GSW, which stands for gunshot wounds.

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 25

1       Q.      Okay.  And it says, Amnesia:  No.

2       A.      Correct.

3       Q.      That just means -- does that just mean

4   a person can remember or has a memory of what's

5   happened to him?

6       A.      Yes.

7       Q.      Okay.  Is there a way you guys

8   determine whether or not they were suffering from

9   amnesia?

10      A.      Well, we just usually ask them what

11  happened.

12      Q.      Okay.  And then a little further down,

13  it starts with, Right -- it looks like, RT shoulder

14  with two holes, and then it lists a number of --

15  RT humerus with one hole, RT thigh with two holes,

16  left thigh with four holes, left buttock with one

17  hole and palpable bullet, ANT chest wall with

18  palpable bullet.

19      A.      Right.  And A-N-T stands for anterior.

20      Q.      And R-T, I'm assuming, stands for

21  right.

22      A.      R-T stands for right, correct.

23      Q.      So that was the initial assessment of

24  the number of gunshot wounds that the patient had,

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 26

1  correct?

2      A.    Sort of, yes.

3      Q.    All right.

4      A.    Actually in the history, you wouldn't

5  actually have a physical examination, but they

6  documented where they found the holes during the

7  history.

8      Q.    Okay.  I see.

9            And if you could just maybe explain

10 for me the difference between -- well, when you see

11 a gunshot wound victim, do you -- and you notice

12 these holes, can you tell whether they're entrance

13 or exit wounds?

14     A.    Sometimes you can, and sometimes you

15 can't.

16     Q.    Okay.

17     A.    I generally -- because I'm not a

18 ballistics expert and not a pathologist, I generally

19 teach my residents, Just document the holes, you

20 can document what they look like; but we should

21 not, as the trauma service, be saying something is

22 an entrance and something is an exit.

23     Q.    Okay.

24     A.    Certainly if you have one gunshot wound

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 27

1    and you have one hole and the bullet retained, you

2    know that's an entrance.

3        Q.    Right.

4        A.    But if you have through-and-through

5    injuries, we, as the trauma service, should not be

6    saying which one's the entrance and which one's the

7    exit.

8        Q.    Okay.  Now, going a little bit further

9    down under the Primary Survey, it indicates,

10   Ethanol: Unknown, Drugs: Unknown.

11            Do you know whether or not this

12   patient was tested for the presence of ethanol or

13   drugs in their system, in their blood, or --

14       A.    All I can say is what the standard care

15   was of the trauma patient.  We did not routinely

16   test patients for drug -- presence of drugs.  The

17   state required us to test all drivers involved in

18   motor vehicle crashes for the presence of ethanol.

19   And so because it's so difficult to determine who

20   is a driver of a car and who wasn't or who was

21   not -- who was involved in a motor vehicle crash

22   and who wasn't, we routinely tested all adult

23   patients for ethanol.

24            So I haven't gone through the

Page 28

1    laboratory results in the medical record to

2    determine whether or not Mr. Banister was tested

3    for ethanol.

4         Q.    Okay.  And then going down to where it

5    starts with the secondary survey, it says, Head and

6    Neck.  And then as it goes down further it says,

7    Secondary Survey Chest: No open wound.

8                   Do you know what that's referring

9    to?

10        A.    According to that, there would be no

11   cut or laceration or opening to the skin on the

12   patient's chest.

13        Q.    Okay.  And at the end of that section,

14   under Secondary Survey Chest it says, No broken

15   ribs.

16                   So an assessment was done to see

17   what on the patient?  Any broken ribs?

18        A.    A physical assessment, correct.

19        Q.    Okay.  And from that physical

20   assessment, it was -- there were no broken ribs.

21        A.    Correct.

22        Q.    Going a little further down to Secondary

23   Survey Pelvis it says, Pelvis is stable, No pelvis

24   fracture.  Right?

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 29

1        A.    Yes.

2        Q.    Okay.  And then going further down to

3   where it says, Musculoskeletal -- I don't know if I

4   pronounced that right.

5        A.    That's right on.

6        Q.    Okay.  There's some notes here

7   regarding bruising.  And it looks like it says, No

8   bruising to the right upper extremities.

9              What does -- what does that mean,

10  "right upper extremity"?

11       A.    Right upper extremity would be right

12  arm.

13       Q.    Same thing, No bruising left upper

14  extremity.  No bruising to the left arm?

15       A.    Correct.

16       Q.    And then, No bruising right lower

17  extremities.  No bruising left lower extremities

18  means there was no bruising to either of the legs.

19       A.    Correct.

20       Q.    Okay.  Then it says a little further

21  down, Cervical spine painless, and Thoracic spine

22  painless and Lumbo- -- I don't know how to

23  pronounce that.

24       A.    Should be lumbosacral.

Page 30

1        Q.    -- (continuing) -sacral spine painless.

2                How are you doing that assessment to

3   determine that there's no pain to the cervical

4   spine and --

5        A.    You're actually physically examining

6   those areas, pressing on them, and seeing if on the

7   examination the patient has any response of pain to

8   the examination.

9        Q.    Okay.  So is there a scale here, or is

10  it just either painless or painful, or how does

11  that work?

12       A.    Correct.  There's no scale.  It's

13  either -- it's sort of a yes-no type of thing.

14       Q.    Okay.  Then it says, Diagnostic

15  Impression, and the rest of the note after that.

16  Can you just explain what "diagnostic impression"

17  stands for or what does that mean?

18       A.    Really, diagnostic impression is not

19  actually accurate.  It should be diagnostic test or

20  something.

21                What it's doing is, it says, Right

22  side ABI, and Left side ABI.  The ABI stands for

23  ankle-brachial index.  And it's a measurement of

24  the patient's blood pressure at their ankle and

Page 31

1    then also at the arm, and a comparison between the

2    two.  It's a bedside test that's done to help

3    determine whether or not any vascular injury is

4    present.

5         Q.    Okay.  And then right under that it

6    looks like the plan was for some X-rays to be done.

7         A.    Correct.

8         Q.    And what X-rays were to be done?

9         A.    According to this, there was supposed

10   to be an X-ray to the chest, two views, both what's

11   known as an A/P, or front-to-back view, and then a

12   lateral view, from the side; two views of the

13   pelvis; there would be X-rays of the right shoulder

14   and humerus, which is the upper arm; and then also

15   X-rayed both femurs, which are the thigh bones.

16        Q.    Okay.  And just going back a second, do

17   you have any indication in your notes as to what

18   time Mr. Banister -- Mr. Banister arrived at Christ

19   Hospital?

20        A.    Yes.

21        Q.    Okay.  And do you see that on a certain

22   document?

23        A.    Yeah.  On page 19 --

24        Q.    Okay.

Page 32

1          A.      -- Bates stamp 19.  Up on the upper

2    portion, the document is Trauma Flow Sheet, sort of

3    on the right -- if you're looking at the page, the

4    right side upper portion near the corner it says,

5    Arrival Time 1315, which would be 1:15 p.m.

6          Q.      Okay.  And then for name it says, Doe

7    Baker.

8          A.      Correct.

9          Q.      Do you know what that means; why that

10   name is there?

11         A.      Yes.  Yes.

12         Q.      Okay.

13         A.      What happens is, again, as I stated

14   earlier, we get -- the hospital receives a call

15   from the field essentially saying they're bringing

16   in a trauma patient.  In order to process the

17   laboratories and be ready for the patient, all

18   trauma patients were assigned a Doe name, and they

19   would be preregistered before they even entered the

20   hospital.  That way their labs could be drawn,

21   because oftentimes patients aren't able to tell us

22   who they are, we don't have identification.  So

23   that way we can -- we can get them in the system

24   and get their testing started without having to

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 33

1     know exactly who they are.

2          Q.     Okay.  I gotcha.

3               And then going back to page 15.  At

4     the bottom of page 15, at least as of -- where it

5     says, Disposition, January 13, 2006, 19:19 hours,

6     it says, Patient:  Disposition: Admission,

7     Condition: Stable.

8               What do -- what do those notes mean?

9          A.     What it indicates again is that -- I

10    had said earlier, a determination is made, Is the

11    patient going home?  Are they going to be admitted?

12    In this case, Mr. Banister was admitted to the

13    hospital.

14               And his condition -- when we say

15    "stable," it means that he was -- his hemodynamic

16    condition, his blood pressure and his heart rate,

17    those types of things, were in -- when we say

18    "stable," in this situation, he's in good condition.

19    He was not suffering, you know, life-threatening

20    injuries at that point in time.

21          Q.     Okay.  And so it would have been at

22    approximately then 19:19 hours that he was admitted,

23    officially admitted.

24          A.     Well, that's what time the nurse

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 34

1    documented that information.

2                But, yeah, it's probably pretty

3    close to that time that he actually was taken out

4    of the emergency room, I'm going to guess, and

5    actually into the hospital.

6        Q.    Okay.  So the record that we were

7    just discussing, 14 through 18, are these records

8    being -- are these entries being made throughout

9    his treatment, or is this something that you do

10   after you've done all these assessments, to go in

11   and enter that determination, or how does that

12   work?

13       A.    Most of the time the entries are made

14   after the fact, because you just don't have time

15   while you're treating the patient to keep running

16   back and forth to the computer to document it.

17       Q.    Um-hmm.

18       A.    So you take care of the patient.  Then

19   you go back and document.

20       Q.    And then this trauma flow sheet that

21   you referred to that has the name Doe Baker on it

22   that starts on Bates-stamped page 19.  It looks

23   like it goes through page 24.

24                Correct me if I'm wrong, but then

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 35

1    would this trauma flow sheet, would these records

2    be the first thing that's created with a patient,

3    or do you get that notification from the field?

4            A.    Yes.   The nurses -- the trauma flow

5    sheet is essentially a nursing documentation form.

6    And if you look on pages -- well, sort of all of

7    the pages, you have sort of a running narrative

8    that's documented in real-time.

9            Q.    Okay.   So these would be notes that

10   are being done in real-time.   And then after the

11   initial assessment is over, then the documents,

12   Bates stamp 14 through 18, would be created.

13           A.    Correct.

14           Q.    Okay.   That makes sense.

15                 Now, if I could go back to this page

16   that's Bates stamped No. 3.

17           A.    Okay.

18           Q.    Can you just describe for me what this

19   document is -- what it is, and what it's filled out

20   for, what the purpose is?

21           A.    Yeah.   This document is entitled

22   Interdisciplinary Plan of Care - Problem List and

23   Goals.   I think this is filled out by the nurses

24   when the patient is first admitted to the hospital.

Page 36

1        Q.    Okay.  So this is something else that's

2   created right at the beginning of the process.

3        A.    Actually not in the emergency room, but

4   I think actually on a regular medical floor.

5        Q.    Okay.  So do you think this was done

6   after Mr. Banister was admitted.

7        A.    Yes, I do.

8        Q.    Okay.  And just looking at page 3 here,

9   the only thing that's checked off is the box next

10  to No. 8, which is Alteration in Comfort.

11       A.    Yes.

12       Q.    What is your understanding of what that

13  means?

14       A.    Well, the area that's circled is Pain.

15       Q.    Um-hmm.

16       A.    So alteration in comfort, the patient's

17  having pain.

18       Q.    Okay.  And to the right, there's some

19  handwritten notes that say, Pa- -- I'm sorry --

20  Pain, and then there's a less than 4 on -- I'm not

21  sure what those initials are.

22       A.    Yeah.  It says -- I mean it looks like

23  NRS to me.  And I'm not sure what that's referring

24  to.

Page 37

1        Q.    Do you know if "pain less than 4" is

2    something that the patient was indicating that's

3    where his pain was on a scale of 1 to 10?

4        A.    You know, as best -- from reading it,

5    that would be my impression, yes.

6        Q.    Okay.

7        A.    Because that's -- that column where

8    that writing is, if you look at the top, that's the

9    goal.

10        Q.    Okay.

11        A.    So it's to get the patient to a pain

12    scale -- or a pain level of less than or equal to

13    4.

14        Q.    You think that was the goal in this

15    case --

16        A.    Yes.

17        Q.    -- or in this situation.

18        A.    Yes.

19        Q.    And none of the other boxes on this

20    page are checked, correct?

21        A.    Correct.

22        Q.    And to the best of your understanding,

23    are these things that the nurse is assessing in

24    regard to the patient as to which boxes to check,

Page 38

1    which -- you know, for goals for the patient?

2         A.    That would be my impression, yes.

3         Q.    So, for example, with No. 2, it says,

4    Coping:  Emotional, Spiritual, Psychological

5    related to anxiety, fear, powerlessness, grief,

6    spiritual care need, quality of, slash, end of life

7    issues, treatment decisions, other.  That's some-

8    thing that the nurse determined was not something

9    that was an issue with this patient.

10        A.    That would be my impression because

11   it's not checked.

12        Q.    Okay.  Moving to the next page stamped

13   4.  Is this -- do you know what this page or this

14   document refers to?

15        A.    It's still part of the Interdisciplinary

16   Plan of Care.  This is Interventions and Outcomes.

17   So it's just a continuation of the page that we

18   talked about on Bates stamp page 3.

19        Q.    And there's nothing actually checked on

20   this page at all, correct?

21        A.    Correct.

22        Q.    And do you know how -- do you know if

23   there's an assessment that's done or how it's

24   determined which things will be, or is this the

Page 39

1    page that refers to whether or not that goal is

2    reached, or do you know?

3         A.    I don't know because I don't -- I'm not

4    typically involved with the use of this form.

5         Q.    Okay.  Fair enough.

6               Going then to Bates stamp page

7    No. 10.  This is entitled Discharge Summary.

8         A.    Correct.

9         Q.    And this looks like this was actually

10   prepared on January 15th of 2006.

11        A.    Correct.

12        Q.    Do you know who prepared or who signed

13   this where it says Physician Signature, slash,

14   Date?

15        A.    It was prepared by -- I'm trying

16   determine.  Looks like -- I don't know if that's an

17   S or a G-u-r-i-a-n-o.

18        Q.    Okay.  And looking at this discharge

19   summary, it says Final Diagnoses:  Left femur

20   fracture.

21        A.    I'm trying see Final Diagnoses.

22               Oh, yes.  I'm sorry.

23        Q.    And then also it says, Multiple GSW

24   right shoulder, left leg, right leg.

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 40

1      A.    Correct.

2      Q.    And then underneath that it says,

3 Reason For Admission:  Left femur fracture.

4      A.    Yes.

5      Q.    Okay.  So on January 13th, 2006 when

6 this patient, Mr. Banister, was admitted, the

7 reason for that was because of the fracture to his

8 left femur --

9      A.    Correct.

10     Q.    -- not because of the gunshot wounds.

11     A.    Correct.  The gunshot wounds in and of

12 themselves -- other than the fact that he suffered

13 a femur fracture, if he had not suffered a femur

14 fracture, the other gunshot wounds in and of

15 themselves may not have been enough of a reason to

16 admit him to the hospital.

17     Q.    Okay.  It also states here, Condition

18 on Discharge:  Good.

19     A.    Yes.

20     Q.    And then Discharge Instructions:

21 Follow up with the trauma orthopedics clinic this

22 week, follow up with the trauma clinic on 1/20/06.

23     A.    Yes.

24     Q.    And the Discharge Date:  January 15th

Page 41

1   of 2006.

2          A.     Correct.

3          Q.     So he -- so Mr. Banister was admitted

4   on the 13th and was released two days later.

5          A.     Yes.

6          Q.     Okay.  Then going back to that trauma

7   flow sheet that started on page 19.

8                 Oh, I'm sorry.  Can I ask you one

9   question -- one other question then regarding that

10  discharge date?

11         A.     Yes.

12         Q.     Where it says, Discharge Condition:

13  Good, if -- what other conditions could there be,

14  as far as discharge?  If you're going to discharge

15  someone, are you going to discharge them in any

16  other condition other than good, I guess is my

17  question.

18         A.     Well, they -- I suppose they could be

19  in fair condition.

20         Q.     Okay.

21         A.     They're certainly not going to be

22  discharge in an unstable condition.

23         Q.     So is fair kind of equivalent to good,

24  or how would you describe that?

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 42

1    A.    You know, that's really a subjective

2  evaluation by the person filling out the form.  So

3  I can't really differentiate between fair and good.

4    Q.    Okay.  But essentially, like I said,

5  if someone is in stable -- either fair or good

6  condition, then they're going to be discharged,

7  right?

8    A.    Correct.  That would --

9    Q.    If they're -- go ahead.

10    A.    That would then be a level of stability

11  that the patient can be discharged.

12    Q.    If they were still -- if he was still

13  on January -- if Mr. Banister on January 15th was

14  still in unstable condition or poor condition, he

15  obviously wouldn't have been discharged on that

16  date, right?

17    A.    Yes, I agree with that.

18    Q.    I'm sorry.  Can I go back to page 13?

19  I skipped a page there.  I had a question about

20  this one?

21    A.    Yes.

22    Q.    Do you know what this document is?

23    A.    This is just a document that's

24  documenting Mr. Banister's vital signs.  They have

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 43

1   two times that are actually -- where it's listed.

2   The second one obviously is not accurate, dated

3   1/13, time 13:14, because they don't have any

4   vital signs listed and that would indicate that

5   Mr. Banister was dead.  And --

6        Q.    Okay.

7        A.    -- we know that to not be the case.

8        Q.    Right.  And that was my question.

9              So the one at 13:14 hours obviously

10   just didn't get entered or it's not indicated here.

11       A.    Correct.

12       Q.    But at 18:50 hours on January 13th, at

13   that point it looks like his pain was a 7.

14       A.    Correct.

15       Q.    And again, that's 1 out of 10?

16       A.    That would -- typically the scale is

17   1 out of 10.

18       Q.    With 10 being the worst, zero being the

19   least -- or 1 being the least?

20       A.    Well, 1 being the least, yes.

21             If I can just say, again, it makes

22   sense that there are no vital signs listed on 1/13

23   at 13:14, because, at least according to the

24   medical record, the patient did arrive to the

Page 44

1    hospital till 13:15.

2         Q.    Great.  Okay.  That explains that.

3    Thank you.

4              Okay.  Then going back to that

5    trauma flow sheet and specifically to page 22, a

6    couple pages in.  The first entry looks like it's

7    at -- is that 13:30 hours?

8         A.    Correct.

9         Q.    And about one, two, three -- four lines

10   down it says, GSW oozing, no signs of hemorrhage.

11             Have you -- you've treated gunshot

12   wounds in the past prior to this January 13th

13   incident, right?

14        A.    Yes.

15        Q.    What does oozing mean when you see it

16   in a record in association with a gunshot wound?

17        A.    It's just that there may be a very

18   small amount of blood coming from the wound.

19        Q.    Okay.  So this isn't a situation --

20   this wasn't a situation then where blood was gushing

21   out of the wound, correct?

22        A.    Correct.

23        Q.    And you say -- when you say oozing as

24   being just a very small amount of blood, maybe

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 45

1    seeping out, is that another way to say it?

2          A.    I would agree with that term, yes.

3          Q.    Okay.  And the same thing towards

4    the -- let's see, I think it looks like under the

5    note at 15:30 hours.  About three lines down, it

6    says, has multiple gunshot wounds that are oozing

7    bloody drainage.

8          A.    Yes.

9          Q.    Is that the same thing?

10         A.    Yes.

11         Q.    There was just a little bit of blood

12   that was seeping out of one of his gunshot -- one

13   of his gunshot wounds or all of them or do you

14   know?

15         A.    I don't know specifically, but I

16   wouldn't be surprised if it was from -- if it was

17   from more than one of the wounds.

18         Q.    Okay.

19         A.    And again, it says "bloody drainage,"

20   which indicates it may not be pure blood, it may be

21   blood mixed with reactive fluid from the injuries

22   themselves, from the gunshot wounds.  So it's blood

23   and serum that's coming out of the wound.  It's

24   just -- it's bloody because there is some blood

Page 46

1    there.

2         Q.    Okay.

3               Going to pages 25 and 26, which

4    are entitled Chicago Fire Department at the top,

5    Incident No. 060130791.

6               Are these records that are created

7    by anybody from Christ Hospital?

8         A.    No.

9         Q.    All right.  So these are records that

10   are created by the emergency -- or I guess the

11   paramedics that would have treated Mr. Banister on

12   the scene.

13        A.    That's correct.

14        Q.    Do you receive a copy of these records?

15        A.    Sometimes yes, sometimes no.  Obviously

16   in this case, we did.

17        Q.    Do you know whether or not you had

18   these when Mr. Banister first came in, or whether

19   or not you guys received these sometime later?

20        A.    Typically, we don't have it immediately

21   when the paramedics bring the patient in.  They

22   usually -- because again, they're caring for the

23   patient, and then they have to go back and do their

24   documentation.  So usually shortly before the

Page 47

1   paramedics leave the hospital, they have created

2   this record and present it to the emergency room

3   staff to put into the patient's medical record.

4        Q.    So you're familiar with these records

5   then.

6        A.    Yes.

7        Q.    You've seen them many times.

8        A.    Yes.

9        Q.    Going under the section entitled

10  Findings where it says Initial, and if you go about

11  one, two, three, four -- five lines down it says,

12  GCS score 15.  What is a GCS score?

13       A.    GCS stands for Glasgow Coma Score.

14  It is a brief physical examination to determine

15  the patient's mental state, their -- sort of their

16  capacity to function, you know, how their brain is

17  functioning.  It is scored -- there are three

18  different parts to it, and it's scored on a level

19  from 3 to 15.  3 being the lowest, 15 being the

20  highest.

21       Q.    And the things that are being assessed

22  are the eyes, verbal, and motor skills.

23       A.    Correct.

24       Q.    Okay.  And it looks like he has a score

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 48

1    of 4 for the eyes.  And it says "spontaneous."

2          A.    Yes.

3          Q.    4 is the highest score you can get for

4    the eyes, right?

5          A.    Correct.

6          Q.    What does that mean, spontaneous?

7          A.    He opens his eyes spontaneously.  He

8    doesn't have to be asked to do it, he doesn't have

9    to be painfully stimulated to do it, or the fact

10   that he doesn't do it.

11         Q.    And verbal it says 5, dash, oriented.

12   5 is the highest score for verbal, right?

13         A.    Correct.

14         Q.    And what does that mean, oriented?

15         A.    You ask him a question, he responds

16   appropriately.  So you ask him, What day is it?

17   And he says, It's Wednesday.

18         Q.    And motor it says, 6, dash, obeys

19   command.

20                6 is the highest score for motor,

21   right?

22         A.    Yes.

23         Q.    And what does that mean, obeys command?

24         A.    Show me two fingers on your right hand,

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 49

1   and he raises two fingers on his right hand.

2       Q.    Okay.  So Mr. Banister, when he was

3   assessed by the paramedics had a perfect score for

4   the GCS, right?  The highest score.

5       A.    The highest score, yes.

6       Q.    And if you go down towards the bottom

7   where there's -- under Care Events, there's a time

8   column there.  It looks like that GCS test was done

9   at 12:59 hours, correct?

10      A.    Yes.

11      Q.    Okay.  Flipping to the second page of

12  that document, that's stamped 26 at the bottom.

13  Under Care Events, continued, at 13:00 where it

14  says Treatment, under the description it says,

15  Bleeding control, type: direct pressure, result:

16  successful.  What does that mean, direct pressure?

17      A.     It means that the paramedic was holding

18  pressure, putting pressure directly on an area that

19  had been bleeding.

20      Q.    When it says "result: successful," that

21  just means that it would be able to -- just using

22  direct pressure was able to control the bleeding,

23  right?

24      A.    Yes.

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 50

1        Q.    Okay.  So at least from these records,

2   it looks like any bleeding -- any gunshot wounds

3   that were bleeding or other injuries that were

4   bleeding were under control pretty quickly, right?

5        A.    Yes.

6        Q.    Now, as they -- we were just talking

7   about when he was discharged, and we mentioned the

8   reason he was admitted was because of that left

9   femur fracture.  The main concern with this patient

10  was this left femur fracture, correct?

11       A.    Well, eventually, once other injuries

12  had been ruled out.

13       Q.    Okay.

14       A.    That's correct.

15       Q.    Okay.  So as far as him being admitted

16  and getting further treatment after that -- those

17  initial assessments, those were all for that left

18  femur fracture.

19       A.    Yes.  That, and obviously pain control

20  and -- because he was in the hospital, just dressing

21  or bandaging of his other gunshot wounds.

22       Q.    Okay.  Can you -- other than just, I

23  guess, pain control and bandaging the wounds, what

24  other care or treatment did you provide for any of

Page 51

1    his gunshot wounds?

2         A.    Well, that would -- that would be the

3    treatment for them.

4         Q.    Okay.  So at least based on the records

5    we've looked at so far, his bleeding was under

6    control pretty quickly, right?

7         A.    Yes.

8         Q.    So you, when you were treating him,

9    were not concerned about any internal bleeding.

10        A.    Again, depending what time frame.

11   Initially when he presented to the hospital until

12   we evaluated where his gunshot wounds were and what

13   they had to fight, we certainly were concerned that

14   potentially he had internal bleeding.  Once he'd

15   been evaluated and admitted to the hospital, at

16   that point in time, there was no indication that he

17   had ongoing -- he certainly didn't have evidence of

18   ongoing internal bleeding.  He still may have had

19   a little bit of oozing, as we described, from the

20   wounds, but not what we would consider medically

21   significant evidence of blood loss.

22        Q.    Okay.  And Mr. Banister was, in fact,

23   operated on for his left femur fracture, correct?

24        A.    Yes.

Page 52

1      Q.   Okay.  Do you know when that was done

2  based on the records?

3      A.   Yes.

4      Q.   When was --

5      A.   He was operated on on the evening of

6  January 13th, 2006.

7      MS. BRUCE:  You know what?  Can we go off the

8  record for one second.

9              (Recess taken.)

10  BY MS. BRUCE:

11      Q.   All right.  I think when we left off we

12  were talking about the fact that Mr. Banister did

13  have an operation regarding his left femur fracture,

14  right?

15      A.   Correct.

16      Q.   Okay.  And you indicated that, at least

17  based on the record, that there was a -- well, what

18  does that mean when you say "fracture to the left

19  femur"?

20      A.   It means there's a break in the bone.

21  It's very commonly -- you get laypeople asking you,

22  you know, Is the leg broken?  Well, yes, he as a

23  fracture.  But is it broken?  It's basically all

24  the same term.

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 53

1        Q.    Okay.

2        A.    It's a broken leg.

3        Q.    And are there different types of breaks

4     that can occur in the bones?

5        A.    Yes.

6        MS. BRUCE:   And I want to show you -- and

7     I'll give you something I got off the Internet.

8     But I want to show you what we'll -- I guess we'll

9     mark as Deposition Exhibit No. 2.

10                     (Deposition Exhibit No. 2,

11                      Witness Fishman, was marked for

12                      identification 5/20/09.)

13    BY MS. BRUCE:

14        Q.    Before I show you this, do you have --

15    is there a notation in these records as to what

16    type of fracture Mr. Banister had in his left

17    femur?

18        A.    Yes, Bates stamp 81.  The X-ray report

19    from the initial X-rays of Mr. Banister's left

20    femur states that there is an undisplaced and

21    angulated fracture involving the mid shaft of the

22    left femur.

23        Q.    Okay.  And can you just describe what

24    that means in laymen's terms?

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 54

1        A.    Well, "undisplaced" means the pieces of

2    the bone are pretty much in alignment and near each

3    other.  And "angulated" means that there is some --

4    it's redundant -- some angulation to the fracture

5    segments themselves, so that it's not lining up

6    in a straight line as a bone normally would be;

7    there's some angle now to the bone off of where it

8    should be a line straight up and down.

9        Q.    Okay.  And then I'll show you what I've

10   marked as Deposition Exhibit No. 2, which are some

11   photographs of some different types of fractures:

12   greenstick, spiral, comminuted, transverse, and

13   compound.

14              Do any of these accurately show what

15   you're describing as the type of fracture that

16   Mr. Banister had?

17       MS. SMITH:  I'm going to object as this is

18   not a document created within the medical record.

19       MS. BRUCE:  Okay.

20              You can answer.

21       THE WITNESS:  They don't per se.  The one

22   that might show some angulation, although it is

23   under Compound but he did not have -- a compound

24   fracture in laymen's terms is where the skin is

Page 55

 1  broken.

 2         MS. BRUCE:  Okay.

 3         THE WITNESS:  And although Mr. Banister had a

 4  break in skin from the gunshot wound that caused

 5  his fracture, that's not what this -- a compound

 6  fracture is.  But in the picture that you've --

 7  pictures that you provided me, the only one that

 8  would closely resemble what the angulated fracture

 9  is would be the one under Compound.

10  BY MS. BRUCE:

11         Q.    Okay.  Other than the fact that it

12  obviously didn't break the skin.

13         A.    Correct.

14         Q.    And so in your -- in the record that

15  you see, Mr. Banister's left femur fracture does

16  not mean that his bone was shattered.

17         A.    I guess shattered is a -- is a

18  subjective term.

19         Q.    Okay.

20         A.    If you could be more specific about

21  what you mean by "shattered."

22         Q.    Well, does it indicate how many breaks

23  were in this bone?

24         A.    No, it doesn't.

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 56

1      Q.    Would you ever use the term "shattered"

2   to describe a break in a bone as a medical term or

3   no?

4      A.    Actually, yes, I have used the term

5   "shattered."

6      Q.    And in what types of cases would you

7   describe a bone as being shattered?

8      A.    Typically high-energy type of injury

9   mechanisms, whether it be motor vehicle crash or

10  high-velocity weapon.  Typically when I use the

11  term "shattered," the bone has lost -- there's

12  multiple pieces and you may have even lost pieces

13  of the bone; they may just be gone.

14     Q.    Okay.  Now, when Mr. Banister was --

15  when the procedure was performed in regards to his

16  left femur fracture, what was done?

17     A.    He had what's known as an "intramedullary

18  rod" placed by the orthopedic surgeon.

19     Q.    And do you know what the purpose of

20  that rod being place in there was?

21     A.    Yes.  What it does is, basically it's

22  sort of an internal cast, if you will.  It aligns

23  the pieces of the bone that are broken and holds

24  them in place so that the bone can then heal.

Page 57

1    Q.    Okay.  And that -- those documents,

2    Bates stamp 27 and then 28, is that just the report

3    from the surgeon who operated on Mr. Banister's

4    leg?

5    A.    Yes.  That is, the Bates stamp pages 27

6    and 28 are the operative report.

7    Q.    Okay.  Do you know what the documents

8    Bates stamp 29 through -- it looks like -- well,

9    Bates stamp 29 starts with Nursing Diagnosis, and

10   then there's a number of pages after it.  I'm not

11   sure where that section ends.

12   A.    These are all -- what you're referring

13   to are the operative record documentation, actually

14   in the -- in the operating room.

15   Q.    Okay.  It starts with page 29 and ends

16   with which page, if you know?

17   A.    It looks like it ends with page 40.

18   Q.    40?

19   A.    Correct.

20   Q.    Okay.  So pages 29 through 40 are just

21   the records that were done -- created during the

22   operation.

23   A.    Yes.

24   Q.    Okay.

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 58

1        A.    And immediately before the operation.

2        Q.    Okay.  And specifically on page 33, at

3    the bottom there's a section that says, Urinary

4    Catheter Size, and then underneath there's some

5    notes next to Urine, and Clear is checked and

6    Yellow is checked.

7              Do you know what the significance of

8    those boxes being checked is?

9        A.    Just that the urine has no blood in it,

10   and the color of it was yellow.

11       Q.    Okay.  So that's indicating then that

12   there was no blood in the urine.

13       A.    Well, what it's indicating is that the

14   urine was clear and that the color was yellow.

15       Q.    So it was normal.

16       A.    Yeah, I would consider that normal.

17       Q.    Okay.  Is that something that's noted

18   preoperation, post, or do you know?

19       A.    This is -- this is preoperative, I

20   believe.

21       Q.    Okay.

22       A.    Actually, it may be intraoperative.

23       Q.    Does that mean during?

24       A.    Yes.

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 59

1        Q.    Okay.  Now, you said that the -- those

2   documents ended with Bates stamp page 40.

3        A.    Yes.

4        Q.    Do you know what the documents Bates

5   stamped 41 and 42 are?

6        A.    Yes.  They're records from the -- what

7   is known as, you know, in laymen's terms, the

8   recovery room.

9        Q.    Okay.  Then moving to page 43, which is

10  entitled Interdisciplinary Plan of Care Notes.  I

11  just, first of all, wanted to ask on -- under Date

12  and Time, the first entry there says -- looks like

13  it says 1/18/06.  Then it says Midwest Orthopaedics.

14            Do you know -- as we discussed

15  earlier, Troy Banister was released or -- from the

16  hospital or discharged on January 15th of '06.  Do

17  you have any explanation as to why that is noted as

18  January 18th, or do you know if that's just a

19  mistake?

20       A.    I think that's probably just the way

21  it's written, the 3 is written.  And it's so small

22  that it kind of got jumbled, so it looks like

23  1/18/06.

24       Q.    You think it should be 1/13/06?

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 60

1       A.    Yes.

2       Q.    Okay.  And do you know who created

3   these notes here?

4       A.    This note on Bates stamped page 43 was

5   created by one of the orthopedic residents by the

6   name of Jim Baker, B-a-k-e-r.

7       Q.    Okay.  And so this is one of the

8   residents that you would have been supervising?

9       A.    Actually, this is one of the orthopedic

10  residents, so he's not really under my supervision.

11      Q.    Do you know if you were present during

12  these notes?

13      A.    I don't know.

14      Q.    Okay.  If you could just take a minute

15  because it looks like there's quite of few notes

16  in here.

17            Are there any notes that you yourself

18  created --

19      A.    Yes.

20      Q.    -- throughout this document?

21      A.    Yes.

22      Q.    Could you just point to those for us?

23      A.    Bates stamp page 47, the lower left

24  portion the note is dated 1/14 at 5:15 p.m.  That's

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 61

1    my handwriting and my signature.

2         Q.    Can you just read what those notes say

3    there?

4         A.    Sure.  Dated 1/14, 5:15 p.m.  Had his

5    femur rodded 1/13.  Patient examined with service.

6    Exam, info noted.  PT, or physical therapy, to work

7    with patient.  Check H/H, hemoglobin/hematocrit

8    a.m. 1/15.  And my signature.

9         Q.    Okay.

10        A.    And then on Bates stamp page 50.

11        Q.    Okay.

12        A.    Again, left lower portion of the note.

13   Dated 1/15 at 3:45 p.m.  Patient cleared PT, or

14   again physical therapy.  Ortho cleared patient for

15   discharge.  Okay to send home.  And my signature.

16        Q.    Okay.  Any other notes that you --

17        A.    No, other than what we talked about in

18   the emergency room where I documented that I'd been

19   present when the patient was evaluated.

20        Q.    Okay.  So at approximately 3:45 p.m. on

21   1/15, patient, meaning Troy Banister, was cleared

22   by physical therapy and by the orthopedic --

23   surgeon or orthopedic who?

24        A.    The orthopedic service.

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 62

1          Q.     -- (continuing) for discharge.

2          A.     Correct.

3          Q.     And it was their -- was it -- was there

4    anyone else that needed to clear him in order for

5    him to be discharged, or were those the two main

6    departments or divisions or --

7          A.     Well, trauma needed to clear him,

8    orthopedics needed to clear him, and physical

9    therapy needed to clear him.

10         Q.     And when you say trauma, was that you?

11         A.     The trauma service, yes.  Maybe not me

12   directly --

13         Q.     Right.

14         A.     -- but the residents working underneath

15   my supervision.

16         Q.     And do you know when trauma cleared

17   this patient for discharge?

18         A.     Basically, he was -- once he had

19   cleared physical therapy and orthopedics said he

20   was okay, from our standpoint, his wounds -- he did

21   not need to be in the hospital any longer for

22   treatment of his wounds.

23         Q.     Okay.

24         A.     You asked if I authored anything else.

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 63

1    I'm just looking through the medical record.  Bates

2    stamp page 60 is an order that I wrote.

3          Q.    Okay.  The one at the bottom?

4          A.    Correct.

5          Q.    And can you just read what that order

6    is?

7          A.    Yes.  The first line is, Lovenox

8    30 milligrams subq Q 12 hours to start a.m. 1/15.

9    And then the next part of the order is H/H a.m.

10   1/15.

11         Q.    And what is Lovenox?

12         A.    Lovenox is a blood thinner that's used

13   in that dosage to prophylax patients against blood

14   clots.

15         Q.    Okay.  Now, if you could just go back

16   to what's stamped page 48.

17               The first note there at 1/14/06 at

18   12:20 p.m., on the first line it says -- I think

19   that's an S, dash, Pt complains of mild pain to

20   left lower extremity.

21         A.    Correct.  That's the -- the S stands

22   for subjective, what does the patient say.

23         Q.    So the patient was complaining of mild

24   pain to left lower extremity.

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 64

1        A.    Correct.

2        Q.    And then a little bit further down it

3   says, Okay to discharge from orthopedic standpoint.

4        A.    Yes.

5        Q.    So based on that note, it looks like as

6   far as from an orthopedic standpoint, he was okay

7   to discharge on January 14th of 2006.

8        A.    That's correct.

9        Q.    Do you know then if it was because of

10  physical therapy who didn't clear him till the

11  following day?

12       A.    Yes, that would be my -- that would be

13  my opinion.

14       Q.    And then the next note underneath, Okay

15  to discharge, it says, Follow up in trauma clinic

16  four days.

17       A.    Yes.

18       Q.    Do you know what he was supposed to do

19  as far as follow up in four days, or what you were

20  recommending he do?

21       A.    Well, actually this is a note from the

22  orthopedic service.  When they say follow up in

23  trauma clinic, they mean in their orthopedic trauma

24  clinic in four days.

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 65

1          Q.    Oh, I see.   Okay.

2                    And do you know what he was supposed

3     to follow up, as far as what he was supposed to do

4     in those four days?  Just check in with them or

5     come back for treatment or --

6          A.    In those four days or what they were

7     going to do when he came back to the clinic?

8          Q.    What they were going to do when he came

9     back in four days.  Sorry.

10         A.    Oh.  Yeah.  They would check on his

11    wounds just to make sure everything was healing

12    appropriately, that there was no evidence of any

13    infections or any problems.

14         Q.    Do you see records in the documents

15    that you have before you that show what happened,

16    or show whether or not he came back in four days?

17         A.    I did not see in my review evidence of

18    the outpatient visits, either with the orthopedic

19    surgeons or with the trauma service.  The records

20    that you've provided me, which are Exhibit 1, all

21    relate to the inpatient care of Mr. Banister.

22         Q.    Okay.  And just going back then to that

23    page that's Bates stamp 43 that I -- we think it

24    says, January 13th of '06.  Just looking at those

Page 66

1    notes that are there, does that appear to be

2    January -- the initial assessment on January 13th

3    or some type of follow-up care on, perhaps,

4    January 18th?

5         A.    No.  This is -- this is the initial

6    consultation --

7         Q.    Okay.

8         A.    -- by the orthopedic resident evaluating

9    Mr. Banister.  And I -- not just because I know,

10   but also under P, which is the plan, it says n.p.o.,

11   so he's not to eat anything.  Consent.  Type and

12   screen, T&S.  Ancef.  Likely to OR in a.m.  Then,

13   Discussed with Branovacki, who was the orthopedic

14   attending.

15        Q.    Okay.

16        A.    So the plan is there for his operation,

17   not evidence that -- after the operation.

18        Q.    Okay.  Then moving to page 65.

19        A.    All right.

20        Q.    This appears to be Troy Banister's

21   discharge record.

22        A.    Yeah.  This is the nursing record

23   that's completed when the patient is discharged.

24        Q.    Okay.  And it looks like, based on

Page 67

1    this, the patient was discharged or at least given

2    his discharge record on January 15th of '06,

3    approximately 19:00 hours.

4         A.    Yes.

5         Q.    So that would be the approximate time

6    he was discharged.

7         A.    That's correct.

8         Q.    And I think, as we talked about earlier,

9    there was a note that he was discharged around

10   19:19 hours, so that's again approximately.

11        A.    Yes.

12        Q.    Under Possible Restrictions (activity,

13   hygiene, driving), there are some notes underneath

14   there for possible restrictions.  Can you read what

15   those notes say?

16        A.    Sure.  It says, Use walker to walk,

17   touch down weightbearing left leg, Vicodin for

18   pain.

19        Q.    And so the patient was given a walker

20   in order to help him walk.

21        A.    Yes.

22        Q.    And what does that mean, "touch down

23   weightbearing left leg"?

24        A.    What it means is that he can -- excuse

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 68

1    me.

2                The orthopedic surgeons determine

3    how much weight the patient can put on the affected

4    leg, and what they want him to do is just basically

5    touch his toes to the ground to help stabilize

6    himself.  They really don't want him putting a lot

7    of weight on the leg that they operated on.

8         Q.    Okay.  And then it says, Vicodin for

9    pain.  "For pain," does that just mean -- well, do

10   you know what that means?  Does that mean he was

11   supposed to just take it as needed for pain, or

12   was there a certain dosage or a time that he was

13   supposed to take Vicodin?

14        A.    No.  He was -- he was supposed to when

15   he had pain, if he had pain, to take Vicodin as he

16   would have been prescribed.

17        Q.    And actually looking at the next page,

18   page No. 66 might answer my question for me.  It

19   says, Vicodin, Purpose pain meds.  And then it

20   looks like it says, One or two tablets every six

21   hours if needed.

22        A.    Yes.

23        Q.    Okay.  So he was supposed to take it

24   just if needed depending on how his pain was.

Page 69

1      A.    Yes.

2      Q.    All right.   Going to page 79, can you

3  tell me what that document is?

4      A.    Yes.   It is a copy of the X-ray report

5  of the chest X-ray that was done on 1/13/2006 of

6  Mr. Banister.

7      Q.    Okay.   And under Finding it says, A

8  portable supine chest film was obtained.

9      A.    Correct.

10     Q.    What does that mean?

11     A.    A "portable" means the X-ray was taken

12 in the emergency room for knowing what the

13 situation is.   "Supine" means that the patient was

14 laying on his back.

15     Q.    Okay.   And then the second sentence

16 underneath that says, Bullet is seen overlying the

17 T5 vertebral body to the left of midline.

18              What does that mean in laymen's

19 terms?

20     A.    Basically, again this is one view of

21 the chest.   It's just a front-to-back X-ray.   So it

22 just gives you information whether or not, in this

23 situation, a bullet is present and where it's

24 located kind of left to right in the body.   It

Page 70

1    doesn't tell you front to back.

2              And what you just read just says

3    there is a bullet present.  It is in the projection

4    of the X-ray.  It's seen sort of in -- you really

5    can't tell if it's in front or in back of, but it's

6    in line with the 5th thoracic vertebral body, which

7    is the 5th thoracic spine bone and just to the left

8    of the middle of the body.

9       Q.    Okay.  Going to the next page, page 80,

10   can you tell me what that document shows?

11      A.    Yes.  This is the -- a copy of the

12   X-ray report of the lateral view of the chest.  And

13   what this did -- what this shows is that the bullet

14   that was seen on the other chest X-ray is actually

15   in the anterior chest within the soft tissue in

16   front of the breastbone and that there are multiple

17   bullet fragments.

18      Q.    And when you're looking -- or, well, is

19   there a difference when you just say there was a

20   "bullet noted" or a "bullet fragment noted"?  Can

21   you tell if it's a complete bullet or if it's just

22   a fragment?

23      A.    You can -- usually you can tell if

24   it's a fragment.  You can't always tell if it's a

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 71

1    complete bullet.  It may look like it's complete,

2    but you might be missing a very small piece of it

3    that you wouldn't be able to tell just from an

4    X-ray.

5         Q.    Looking at pages 87 through 92, those

6    appear to be physical therapy notes.  Would you

7    have any -- would you have had any involvement in

8    the physical therapy that Mr. Banister received?

9         A.    Well, I wouldn't have actually performed

10   the physical therapy.  Under the direction of the

11   trauma service, the order for physical therapy may

12   have been placed, or possibly orthopedics may have

13   done it in the postoperative orders.

14        Q.    That's not something you're present for

15   or involved in at all?

16        A.    No.  Generally, no.

17        Q.    In this case, does it appear you had

18   any involvement or participation or --

19        A.    No.

20        Q.    Okay.  Other than the Vicodin that was

21   prescribed for Mr. Banister, was he given -- I

22   think you indicated earlier he was given some pain

23   medication while he was there and admitted into the

24   hospital, correct?

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 72

1          A.    Well, it's documented in the emergency

2    room record.  Let me double-check because we

3    actually haven't talked about this, but ...

4                It's documented that he did receive

5    pain medication in the emergency room, Bates stamp

6    page 23.

7          Q.    Okay.  Does it note what type of pain

8    medication was given?

9          A.    Yes.

10         Q.    What was that?

11         A.    Morphine.

12         Q.    Okay.

13         A.    And then ...

14               And then also Bates stamp page 115.

15    He was also given a medication called Norco,

16    N-o-r-c-o, which is similar to Vicodin.  It's a

17    hydrocodone-acetaminophen combination medication.

18         Q.    Okay.

19         A.    Just for clarification, also on Bates

20    stamp page 115, it appears he was also given some

21    morphine.

22         Q.    Okay.

23         A.    As far as I can tell, these are --

24    these are the pain medications that he received.

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 73

1        Q.    And other than the medication that you

2   just discussed for pain, was he given any other

3   types of medication for any other reason?

4        A.    Well, I also mentioned the Lovenox to

5   prevent blood clots.  He was given antibiotics to

6   prevent infection associated with the time of his

7   surgery.

8              And then he was also given other

9   kind of comfort care medications.  He was given

10  some medication called docusate, d-o-c-u-s-a-t-e.

11  That's just to help -- the pain medication can be

12  constipating, so to help with his bowels.  He was

13  also given a medication called Metoclotramide,

14  M-e-t-o-c-l-o-t-r-a-m-i-d-e, which may -- has

15  different uses, but in this situation was probably

16  for nausea.

17       Q.    Okay.

18       A.    And I believe from when I looked at the

19  medical record, those were all the medications that

20  I saw given.

21             Let me just check the orders, see if

22  anything else was given.

23             Well, in the emergency room he was

24  given Versed, which is sort of a sedative.   And

Page 74

1      that was at the time, I believe, documented by the

2      nurses that he was given sedation when the -- when

3      the trauma service put sort of a partial cast on his

4      broken leg.

5           Q.    Okay.

6           A.    And I think -- let's make sure there

7      were no other medications given.

8                 The only other medication that was

9      given in the emergency room -- no, it was given

10     in -- in the emergency room was tetanus prophylaxis.

11          Q.    And what is that; a tetanus shot?

12          A.    A tetanus shot, yeah.

13          Q.    Now, in your review of the records, I

14     know the initial records didn't indicate whether or

15     not he was ever tested for the presence of alcohol.

16                Does it look as if he ever was, in

17     your review at all the records in front of you?

18          A.    Give me a couple minutes here.

19          Q.    Sure.

20          A.    Excuse me.

21                Yes, he was tested for alcohol.

22          Q.    Okay.  And --

23          A.    Bates stamp page 74 is the result.

24          Q.    And what was the result?

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 75

1        A.    None detected.

2        Q.    Okay.  Now, we talked a little bit

3   about the notes that indicated there was some

4   oozing from some of his gunshot wounds.  In your

5   review of the records, did it appear that there

6   wasn't, for lack of a better word, a lot of blood

7   coming out of the gunshot wounds or near the

8   gunshot wounds?

9        A.    Yes, that would be my impression.  The

10  nurses documented oozing, no hemorrhage.  So there

11  was no, what we could consider, active, significant

12  bleeding.

13       Q.    And is that usual or unusual with

14  gunshot wounds in your experience?

15       A.    No, it's pretty normal that they ooze a

16  little bit, especially if they haven't struck a

17  major blood vessel, that --

18       Q.    Okay.

19       A.    -- there's not a lot of blood coming

20  out of it.

21       Q.    Okay.  So if they did strike an artery,

22  for example, maybe there would be a lot of blood,

23  but normally it's just this little bit of oozing.

24       A.    That's correct.

Page 76

1      Q.    And then just to be clear, other than

2   the surgery that was done for the left femur

3   fracture, there was not any surgery done for any

4   other gunshot wounds.

5      A.    Any other gunshot wounds, that's

6   correct.

7      Q.    Okay.  Now, correct me if I'm wrong,

8   but Troy Banister had ten gunshot wounds, correct?

9      A.    Yeah.  When I counted up what was

10  documented on page -- the nursing flow sheet from

11  the emergency room -- let me get that in front of

12  me.

13         MS. SMITH:  Page 20.

14         THE WITNESS:  Thank you.

15             As best as I could determine, what

16  was documented on page 20 was that there were ten

17  holes, that's correct.

18  BY MS. BRUCE:

19      Q.    Okay.  And there were also two bullets

20  that remained in Troy Banister, correct?

21      A.    Well, yes.  I guess there's the one in

22  his chest and the one in his thigh --

23      Q.    Okay.

24      A.    -- I believe.  But they said that there

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 77

1   were fragments in the thigh; they didn't say if

2   there was full -- they did not document a full

3   bullet.

4        Q.    Okay.  So there was the bullet in the

5   chest area and then at least a bullet fragment or --

6   or more than one fragment?

7        A.    The X-ray report said multiple fragments,

8   I believe.

9        Q.    Multiple fragments -- within the left

10  thigh, you said?

11       A.    Left, correct.

12       Q.    Okay.  And I think when I looked at

13  your criminal testimony, you --

14       A.    I said -- if I may.

15       Q.    Sure.

16       A.    I haven't come across it.  I said I

17  believed in the criminal testimony that I thought

18  Mr. Banister was shot six times.

19                     (Brief pause.)

20  BY MS. BRUCE:

21       Q.    Okay.  So you recall your testimony in

22  which you thought, in your opinion, Mr. Banister

23  had been shot six times?

24       A.    Yes.  In the copy of my criminal

Page 78

1    testimony, pages 12 and 13, is a discussion about

2    the number of shoot -- the number of gunshot wounds

3    that -- or number of times Mr. Banister had been

4    shot.

5                    And just for clarification, the

6    question was asked of me:  Based on the fact that

7    Mr. Banister had two lodged bullets and that there

8    were ten wounds overall as a result of the path of

9    the bullets, how many times, in your opinion, had

10   Mr. Banister been shot?

11                   And I responded six times.

12        Q.    Okay.  Has your testimony changed at

13   all based on the fact that you saw that it was

14   actually multiple fragments in the thigh, or is

15   that still your opinion?

16        A.    No.  That would -- that would still be

17   my opinion.

18        Q.    Okay.  And I know it's in your criminal

19   testimony, but if you could just describe how you

20   go about coming to a determination of the six

21   times.

22        A.    Sure.  What I teach the residents and

23   what I've been taught is that the way you determine

24   the number of gunshots that a patient has suffered

Plaintiffs' Exhibit 2

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 79

1    is you add up the number of holes the patient has

2    and the number of retained bullets, and then you

3    divide by two.  And the reason for that is, that if

4    a bullet goes in and out of your body, it causes

5    two holes and no bullets.  If it goes in and stays

6    there, you have a hole and a bullet.

7                    So if you take just one gunshot

8    wound, it's either going to have two holes, in and

9    out, and no bullet or a hole and a bullet.  So

10   that's how you come up with the number of gunshots

11   that you believe the patient suffered; by adding up

12   the number of holes and the number of retained

13   bullets.

14                   The only time that that gets thrown

15   off -- not the only time, but usually the only time

16   it gets thrown off is if the patient has been shot

17   before and has a retained bullet from the previous

18   shooting.

19        Q.    Okay.  Did you have any evidence that

20   this individual had been shot before and had a

21   previously retained bullet?

22        A.    No.

23        Q.    Okay.  Going back to that page 20 -- I

24   think you have it in front of you -- there's a

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 80

1   diagram there of a front view and I guess a view

2   from the back of an anatomical -- or how would you

3   describe the person, the way they're standing?

4          A.    In the -- there's two pictures there.

5   One is a view of the body from the front, and one

6   is a view of the body from the back.

7          Q.    Okay.  And there's some, what appears

8   to me -- but correct me if I'm wrong -- notes as to

9   where the gunshot wounds were on these two diagrams.

10         A.    That's correct.

11         Q.    Okay.  Is that something you created or

12  someone else created?

13         A.    The nurse created this.

14         Q.    And can you, just based on these two

15  diagrams, describe where this at least indicates

16  there were holes in the individual?

17         A.    Yes.  It appears there are three areas

18  of gunshot wounds near the right upper arm, there

19  are two wounds on the front of the right thigh,

20  three wounds on the front of the left thigh, and

21  then two wounds on the back of the left thigh --

22  back, slash, side of the left thigh.

23         Q.    And this diagram doesn't indicate it,

24  but it was the left femur that was the broken bone

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 81

1  on Mr. Banister, right?

2      A.    Yes.  It actually does document that

3  there's a fracture, slash, deformity.  On the left

4  thigh in the front view of the body, the middle

5  line associated with it says, 8, comma, 10.  If you

6  look at the key above that, 10 is gunshot wound,

7  8 is fracture, slash, deformity.

8      Q.    And I didn't ask you this earlier, and

9  I made an assumption, but the femur then is in the

10  part of the leg higher than the knee.

11      A.    Correct.  It's the thighbone.

12      Q.    Thighbone.  Okay.  Thank you.

13          Okay.  Now, you were also asked some

14  questions at the criminal trial about, and I'm

15  going to first talk about, you noted there were the

16  three holes to his right shoulder area, it looks

17  like.  There's two on the shoulder and then one

18  near the armpit.

19      A.    Correct.

20      Q.    And you were asked whether or not to a

21  reasonable degree of medical certainty there was

22  any medical condition that Troy Banister suffered

23  from that would have prevented him from being able

24  to throw a gun with his right hand.  And I believe

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 82

1   you testified that, in your opinion, nothing would

2   have prevented him medically from throwing the

3   weapon; is that correct?

4        A.    Yes.  That was my answer on page 15 of

5   the criminal testimony.

6        Q.    Okay.  And again, I know you already

7   gave your explanation for why you gave that

8   opinion, but if you could briefly again state your

9   opinion.

10       A.    According to what I said and from

11  review of the medical record, Mr. Banister did not

12  suffer any structural damage of significance to

13  his right arm or shoulder, he had no broken bones,

14  there's no evidence of any nerve injury to the

15  right arm or right shoulder that would prevent him

16  from moving his arm in a throwing motion.

17       Q.    Okay.  So, for example, he could have

18  thrown a handgun approximately 40 feet with his

19  right hand.

20       A.    There's nothing that I --

21       MS. SMITH:  I'm going to object; calls for

22  speculation.

23       MS. BRUCE:  Okay.

24       THE WITNESS:  There's no indication to me

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 83

1  that would -- from the injuries that he suffered,

2  from the gunshot wounds that he suffered, that

3  would prevent him from throwing an object, whether

4  it be a baseball or a handgun, a distance.

5  BY MS. BRUCE:

6      Q.    And we talked a little bit earlier

7  about how when Mr. Banister was discharged, he was

8  discharged and was to use a walker, correct?

9      A.    Correct.

10      Q.    Was that another -- was that another

11  reason why that might support -- that would support

12  your opinion that he would have been able to use

13  his right arm to throw an object because of being

14  discharged with a walker as opposed to a wheelchair?

15      A.    Well, certainly, the fact that he can

16  use a walker indicates that he can use his upper

17  extremities, both left, which was not injured, and

18  his right arm, which did have gunshot wounds.

19  He's able to use the walker, it would appear without

20  restriction, because if that weren't the case, then

21  he wouldn't have been discharged with a walker.

22  So it just says that he has function and not

23  significant amounts of pain that would restrict him

24  from using a walker at that point in time.

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 84

1        Q.     Okay.  And you also had indicated
2    earlier that as far as the weightbearing, he was
3    not supposed to put any weight on his left leg
4    other than touch his toes to the ground, correct?
5        A.     Correct.
6        Q.     So all of his weight would be on his
7    right leg as well as his arms using the walker --
8    hands using the walker.
9        A.     Predominantly, almost -- almost all of
10   his weight would be on his -- would be supported by
11   his right leg and his arms with a walker.
12       Q.     And he was discharged with the walker
13   and able to do that two days after the shooting,
14   right?
15       A.     Yes.
16       Q.     Okay.  Now, you were also asked some
17   questions about whether or not Mr. Banister would
18   be able to run or walk or limp during the criminal
19   examination -- I'm sorry -- during the criminal
20   trial.  And I just wanted to ask you a couple
21   questions to follow up with that.  And I think --
22   I'm not exactly sure where that starts, but ...
23                  Essentially, what I want to ask you
24   is, as we've discussed quite a bit, he had this

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 85

1    left femur fracture as well as at least two gunshot

2    wounds on his right thigh, and then it looks like

3    two holes on the front of his left thigh and two

4    holes on the back of his left thigh.  Was there

5    anything about the wounds to his lower extremities

6    that would have prevented him from crawling?

7         A.    Nothing that I -- that I could think

8    of, no.

9         Q.    Okay.  And same thing with the gunshot

10   wounds that we already discussed to his right

11   shoulder and armpit; anything about those wounds

12   that would have prevented him from crawling?

13        A.    No, I don't believe so.

14        Q.    Okay.  And as you've discussed earlier,

15   you can't tell whether or not any of the holes that

16   were found on Mr. Banister are entry wounds or exit

17   wounds, right?

18        A.    That's correct.

19        Q.    So would you be able to testify to a

20   reasonable degree of medical certainty as to how

21   Mr. Banister was positioned when he received any of

22   these holes that are documented in this diagram on

23   page 20?

24        A.    No.

Page 86

1    Q.    And then going back to those three

2    gunshot wounds or the three holes on Mr. Banister's

3    right upper shoulder and arm area.  There's three

4    gunshot wounds or holes in that area, correct?

5    A.    Yes.

6    Q.    And then you mentioned earlier there

7    was one bullet that was in his, I think, chest

8    area.

9    A.    Correct.

10    Q.    So at least as far as those three holes

11    go, can you determine whether or not those are --

12    how many of those are entrance wounds and exit

13    wounds, based on the fact there was one bullet

14    retained?

15    A.    It would be my opinion that there are

16    two entrance wounds and one exit wound in the right

17    upper portion of Mr. Banister's shoulder, slash,

18    arm.

19    Q.    But you would just -- wouldn't be able

20    to say which are the entry and which are the exit,

21    correct?

22    A.    That's correct.

23    MS. BRUCE:  I think I'm about done.  If we

24    could just take a couple minute break --

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 87

1          MS. SMITH:  Sure.

2          MS. BRUCE:  -- so I could go over my notes.

3                    (Recess taken.)

4    BY MS. BRUCE:

5          Q.    Okay.  Just a couple last questions.

6    Just about done.

7                    When we were talking earlier about

8    the primary survey and the secondary survey that

9    were done of Mr. Banister, you -- I believe you

10   indicated that you were present kind of supervising

11   what was going on, but you weren't the one that

12   actually did those assessments.

13         A.    That's correct.  That would be my

14   routine.

15         Q.    Okay.  Can you tell from the record

16   here, the document of the primary survey, who was

17   actually doing that assessment?

18         A.    Yes.  It should be listed.

19                    It may have been -- let me just see.

20   One second.

21                    Yeah.  It was a resident by the name

22   of -- I'm going to spell it for you -- first name

23   is Ejaaz, E-j-a-a-z, and last name is Kallmullah,

24   K-a-l-l-m-u-l-l-a-h.

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 88

1      Q.    And that was the person then that did

2  the primary survey, the secondary survey, took the

3  history, all those things we discussed about when a

4  patient first comes in.

5      A.    Yes.  I would -- that would be my

6  impression.  He's the one who -- well, he's

7  certainly the one who documented it.

8      Q.    Okay.  And you know that because of

9  the -- is it EK5 was his code?

10     A.    Correct.  Then on page 16 is the key --

11     Q.    Okay.

12     A.    -- for the different names and codes.

13     Q.    There it is.  Okay.

14           And then going back to page 20.  I

15  know we talked earlier about the GCS that was done.

16  I think, that sort of -- those are the initials --

17  GCS test or whatever was done by the paramedics.

18  It looks like here that it's again documented on

19  this.  It says Revised Adult Trauma Score.

20     A.    Correct.

21     Q.    And then right underneath it says

22  Glasgow Coma Scale, which I'm assuming is the GCS.

23     A.    Yes.

24     Q.    Is that -- does that mean it's been

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 89

1   redone here or he was retested here?

2         A.    Yes.  He's -- a GCS is redone in the

3   emergency room.

4         Q.    Okay.  And I just wanted to know, it

5   looked like the scores are identical.  So 4 for eye

6   opening, 5 for verbal, and 6 for motor, correct?

7         A.    Yes.

8         Q.    So it's still 15, which is the highest

9   score.

10        A.    Correct.

11        MS. BRUCE:  Okay.  That's all I have.

12                      EXAMINATION

13  BY MS. SMITH:

14        Q.    Dr. Fishman, you still maintain that

15  Troy Banister was shot six times, right --

16        A.    Yes.

17        Q.    -- based on your criminal testimony?

18        A.    Yes.

19        Q.    So in your opinion, that would mean

20  that he had to sustain some entry and exit wounds.

21        A.    Yes.

22        Q.    And those add up to the ten bullet

23  wounds that you counted in the diagram.

24        A.    That's correct.  I reviewed and I

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 90

1    remember that on one of the X-ray reports, it said

2    he had a retained bullet in his pelvis.  So that

3    would account for the other retained bullet.

4         Q.    Okay.

5         A.    So he has two retained bullets and ten

6    wounds, which adds up to twelve wounds and bullets,

7    you divide by two, that equals six gunshot wounds.

8    The fact that he has two retained bullets means

9    that he has six entrance wounds and four exit

10   wounds total on his body.  Which ones are which,

11   again, I wouldn't testify to.

12        Q.    Thank you.

13              Now, can you describe the injury to

14   the right humerus in his -- is that the right

15   shoulder area?

16        A.    Right humerus is the right upper arm

17   bone.  The humerus is the arm bone, so the funny

18   bone and the right upper arm.

19        Q.    So based on the diagram on page 20 of

20   Exhibit 1, that would include the injuries that

21   are indicated at the right shoulder.  The three

22   different holes that are indicated there --

23        A.    Yes.

24        Q.    -- that would all be the humerus area.

Page 91

1      A.    Yes.   Right humerus -- right upper

2   humerus, right shoulder, yes.

3      Q.    Do you remember that one of those

4   injuries was sustained in the armpit area?

5      A.    I don't -- I don't recall specifically,

6   and certainly not independently.

7      Q.    You may want to look at your criminal

8   testimony, page 22.   Maybe that will help jog your

9   memory a bit.

10      A.    Yeah.   As best I can tell, again going

11   back to the picture on page 20, the nurses

12   indicated the -- if you look at the right upper

13   portion of the body on the front view, the third

14   line in the upper portion of the right body, the

15   line goes to the area around the armpit.

16      Q.    Okay.

17      A.    Whether it's actually in the armpit or

18   the upper part inside of the right arm or just onto

19   the chest wall, I can't say specifically, and I

20   don't see any word documentation that helps me

21   specifically.

22      Q.    Okay.   If Mr. Banister's arm had been

23   down at his side or pointing straight forward at

24   the time that he sustained the injury to -- I'll

Page 92

1  call it the right armpit area, for lack of a better

2  term, would you also say that it would have been

3  possible to sustain additional injuries to his arm,

4  say, if a projectile was coming in that direction?

5       MS. BRUCE:  Object to the form and speculation.

6  BY MS. SMITH:

7       Q.   If his arm had been down at his side or

8  pointing straight forward, would you --

9       A.   I'm sorry.

10      Q.   So pointing -- so down --

11      A.   Down.

12      Q.   -- at his side --

13      A.   Right.

14      Q.   -- or pointing straight forward.

15      A.   Straight forward.

16           You had your arm --

17      Q.   I'm sorry.  I wasn't demonstrating.

18  I'm sorry.

19      A.   I'm sorry too.

20      Q.   Down at his side or pointing straight

21  forward --

22      A.   Okay.

23      Q.   -- would you say that it was possible

24  that he could have -- if the projectile was coming

Page 93

1    at him towards his right shoulder area, if he could

2    have still sustained some injury to his arm with

3    that one -- I'm sorry.

4                I don't -- I don't understand the

5    markings.  But there seems to be one marking on the

6    diagram on page 20 of the exhibit that's right near

7    the armpit area.  Would you, in your estimation,

8    think he would have sustained additional injury to

9    his arm, say the inside of the forearm?

10        MS. BRUCE:  I would just object again as to

11   the form of the question and speculation.

12        THE WITNESS:  The answer is I don't know.

13        MS. SMITH:  Okay.

14        THE WITNESS:  I don't know what position

15   Mr. Banister's arm was in at the time he was shot.

16        MS. SMITH:  Okay.

17        THE WITNESS:  All I can say is the results

18   of the shooting, for whatever position he was in,

19   didn't cause him significant anatomical injury in

20   that area of his arm and chest.

21   BY MS. SMITH:

22        Q.    Okay.  Now, in order to sustain that

23   particular injury in that particular area of the

24   armpit, I guess for lack of a better term, would

Page 94

1    you say that he could have sustained that, say, if

2    he was in a surrender position with his arms

3    raised?

4        MS. BRUCE:  Objection; form, speculation.

5        THE WITNESS:  Again, I would -- I would say I

6    don't know because I don't know which wounds are

7    entrances and exits.

8        MS. SMITH:  Okay.

9        THE WITNESS:  So again, I don't -- I can't

10   say at what angle whoever shot him was at in

11   relationship to his body.  So I guess my answer is

12   I don't know.

13   BY MS. SMITH:

14       Q.    And he could sustain an injury whether

15   he was -- because when you're getting shot, you're

16   moving.  I guess you're not in an anatomical

17   position.

18       A.    That --

19       Q.    That would concur with what you're

20   saying, that you can't assess exactly how he

21   sustained that particular injury.

22       A.    Correct.  Correct.

23       Q.    Okay.  Based on your -- you know, based

24   on your experience, injured as he was with three

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 95

1    wounds in his upper right extremity and lying on

2    the ground because of other injuries -- you know,

3    because he had a broken left leg, as you've

4    testified to today, and given the pain that he

5    would have been in after having sustained ten

6    bullet wounds -- would you say that it would be

7    possible for him to raise his right arm and throw

8    an object 40 feet?

9         A.    Yes.  I would -- I would still say, at

10   least from an anatomic and physiologic standpoint,

11   there's nothing, in my opinion, that would preclude

12   him from throwing an object.  Again, 40 feet, I

13   can't say as to how far he can throw; I don't know

14   anything about Mr. Banister's pitching history or

15   something along those lines.  But again, there's

16   still nothing that indicates to me per se that, at

17   least from the injuries that he suffered to his

18   right upper arm, would prevent -- and even the rest

19   his body that would necessarily prevent him from

20   throwing an object.

21        Q.    Okay.  I'm going to take you back to

22   page 3 of Exhibit 1, where you were asked about

23   emotional injuries indicated by the nurse.

24        A.    Yes.

Page 96

1        Q.    Is it your experience that a patient

2    could still be referred to a psychotherapist on

3    staff later on during their admission even if that

4    initial marking was not made on the particular

5    sheet?

6        A.    Yes.

7        Q.    Okay.  And I just wanted to clarify,

8    the left femur fracture that Mr. Banister sustained,

9    that was due to gunshot wound, correct?

10       A.    Yes.  That would be my opinion, yes.

11       Q.    Okay.  Even though he could have been

12   released from the hospital within two days of

13   admission, does this make his injuries any less

14   serious in terms of the ten bullet wounds that he

15   sustained?

16       MS. BRUCE:  Objection as to form.

17       THE WITNESS:  No.  I mean, they are what they

18   are.

19   BY MS. SMITH:

20       Q.    It is still trauma to the skin, trauma

21   to the muscles.

22       A.    Yes.  It's just that he's released from

23   the hospital because there's -- the amount of care

24   that he requires does not demand that he stay in

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 97

1    the hospital.  There's not an intensity of service

2    needed that requires hospitalization.

3         Q.    Thanks for clarifying that.

4              At the present time, Mr. Banister

5    still experiences some stiffness in his shoulder,

6    and he can't lift heavy objects for long periods of

7    time, and he can't run for more than a block.

8    Would you say that, in your experience, these

9    symptoms are pretty normal at this stage, three

10   years later?

11        MS. BRUCE:  Objection; assumes facts not in

12   evidence, speculation.

13        THE WITNESS:  In my experience, it would be a

14   little bit unusual that two years later that he

15   still experiences trouble with his arm and that he

16   can't run.  Again, I haven't had the opportunity to

17   examine him --

18        MS. SMITH:  Right.

19        THE WITNESS:  -- or see how well he's healed

20   up from his -- certainly from his bony injury.  We

21   didn't have evidence of the follow-up visits, that

22   he actually had them.

23              So just as a general rule, patients

24   that I've seen who have come back to me, whether

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 98

1    they've been shot again or just for some reason

2    have come back to see me for some other reason,

3    most people heal up pretty well.  They're left

4    with scars from the gunshot wounds and from their

5    surgery, but they pretty much resume normal

6    function.

7    BY MS. SMITH:

8        Q.    And this is because of accessibility to

9    physical therapy, would you say?

10       A.    No.  I think it's -- I thinks it's just

11   the way the body heals.

12       Q.    Just the way the body heals.

13             You were asked about outpatient

14   visits earlier today.  Were you aware at the time

15   that Troy Banister was actually in custody when you

16   treated him?

17       A.    Yes.

18       Q.    So it would follow, perhaps, that he

19   couldn't follow through on out visit -- outpatient

20   visits because of his condition of being in

21   custody.

22       MS. BRUCE:  Objection; speculation.

23       THE WITNESS:  That certainly is a possibility

24   if he -- if he remained -- depending on -- I know

Plaintiffs' Exhibit 2

Page 99

1    he was in custody.  He was actually not -- he was

2    not discharged home, he was actually transferred to

3    Cermak Hospital --

4           MS. SMITH:  Right.

5           THE WITNESS:  -- after his release from

6    Christ Hospital.  So he was still under the custody

7    of -- at that point in time, I guess it would be

8    Cook County Sheriffs.  When and if he was released

9    from that custody, I don't know.  And it may have

10   precluded him from doing his follow-up visits as it

11   was recommended to him.

12   BY MS. SMITH:

13          Q.    Okay.  Had you treated other people in

14   custody --

15          A.    Yes.

16          Q.    -- during your time at Christ Hospital?

17          A.    Yes.

18          MS. SMITH:  Julia, we're going to take five

19   minutes just --

20          MS. BRUCE:  Okay.

21                      (Recess taken.)

22          MS. SMITH:  Okay.  We have nothing further.

23

24

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 100

FURTHER EXAMINATION

1

2    BY MS. BRUCE:

3        Q.    Okay.  Just a couple follow-up

4    questions.

5                You were asked a question by

6    Ms. Smith about what you would, I guess, see as

7    far as a patient healing after receiving gunshot

8    wounds.  Can you give, in your best, you know --

9    based on your experience, how long would it take

10   someone to be kind of back to normal, as she said,

11   after receiving these gunshot wounds as Troy

12   Banister did?

13       A.    Well, generally the skin will heal in

14   a fairly timely fashion.  Oftentimes -- I mean,

15   gunshots take a little bit longer to heal because

16   they're a round injury as opposed to a cut either

17   that a surgeon would put on your body or that you

18   might get cut if you cut yourself with a knife or

19   get cut with a piece of glass, which is a linear

20   cut.  But typically the skin will seal anywhere

21   between 48 hours to, say, a couple of weeks in most

22   of the gunshot wounds that I've dealt with.

23                The tissues underneath -- the injury

24   to the tissues underneath in Mr. Banister's case

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 101

1    except for the broken thighbone, the soft tissues,

2    the muscles and such that were damaged, they can --

3    healing usually takes about six weeks to occur in

4    those situations.

5                    That's the general feeling about

6    healing of the body in general.  If we operate on

7    somebody, usually we don't let them go back to

8    doing heavy physical activity for six weeks because

9    what -- it's been shown how long the body takes to

10   heal.  It can take longer, it can take shorter

11   depending on the individual, but that's a general

12   rule of about six weeks.

13                   And again, there will be some scar

14   tissue left behind from the gunshot wound,

15   certainly on the skin.  Internally, I don't know,

16   because I've never examined somebody in a post, or

17   in a postmortem examination, who's been shot.  But

18   certainly in the skin, there's scar tissue left

19   behind.

20        Q.    Okay.  And then in regard to the left

21   femur fracture, as far as a broken bone, in your

22   experience, how long does something like that

23   normally take to heal?

24        A.    Again, the standard rate of healing is

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 102

1    about six to eight weeks.

2        Q.    Okay.

3        A.    The orthopedic surgeons follow these

4    patients out with X-rays to see that there is

5    evidence of healing, because some patients doesn't

6    heal.  That's called a "nonunion."  But if a --

7    most patients that do heal, usually within six to

8    eight weeks, they're allowed to go back -- if the

9    X-ray shows evidence of it, they're allowed to go

10   back to full activity.

11       Q.    Okay.  So that in Mr. Banister's case,

12   it would have been approximately June of '06, if

13   this incident occurred in January of '06?

14       A.    Actually, no.  I would say January,

15   February, March -- probably March/April.

16       Q.    Okay.

17       A.    And again, I don't have any knowledge

18   or evidence that's here as to whether or not he

19   healed according to what I'm saying is the -- sort

20   of the general principles.

21       Q.    And you were asked -- I guess your

22   information that you had was that Troy Banister was

23   taken directly to Cermak Hospital.

24       A.    That's correct.  From my review of the

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 103

1    chart, it looks like he was discharged -- Cermak

2    was contacted, and it looks like he was discharged

3    under the custody of what would be -- if he was

4    going to Cermak, would be in the custody of the

5    Cook County Sheriffs and would be taken to Cermak

6    in their custody.

7         Q.    Okay.  And you just don't know one way

8    or another whether or not he had physical therapy

9    when he was at Cermak or not, right?

10        A.    I have no knowledge, correct.

11        Q.    Okay.  And then I just want to show you

12   on -- I don't have a copy, but I'll make a copy

13   after the deposition.  It's a medical record from

14   Cermak -- Emergency Room Record from Cermak dated

15   8/18/07.  And I just want you to take a quick look

16   at it.

17        MS. BRUCE:  You can look at it first.

18             It's also what we received pursuant

19   to subpoena.

20        MS. SMITH:  I'm going to object.  He has no

21   personal knowledge of this document.

22   BY MS. BRUCE:

23        Q.    Okay.  I'll just let you take a look at

24   that emergency record from Cermak.  It appears to

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 104

1  be dated 8/18/07.

2       A.    Yes.

3       Q.    And, sorry, only because I don't have a

4  copy of it, could I take a quit look?

5             Yeah.  The name of the patient

6  listed there is Troy Banister.  And then there's a

7  History, slash, Complaints.

8       A.    Yes.

9       Q.    And based on that record, it appears

10 that Mr. Banister had an accident while he was

11 playing basketball.

12      A.    That is what's documented here, yes.

13      Q.    So at least as of 8/18/07, Troy Banister

14 was healed well enough to be playing basketball

15 based on your review of that record.

16      MS. SMITH:  Objection; calls for speculation.

17      THE WITNESS:  Yes.  To what's documented

18 here, it appears that he was well to play -- that

19 he was playing basketball.

20      MS. BRUCE:  Okay.  And I guess I'll have you

21 mark this as Exhibit No. 3.

22                         (Deposition Exhibit No. 3,

23                          Witness Fishman, was marked for

24                          identification 5/20/09.)

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 105

 1   BY MS. BRUCE:

 2        Q.    And is that -- does that appear to be

 3   normal as far as what you testified to earlier in

 4   regards to normal healing for a patient, that maybe

 5   by a year and a half later, an individual who had

 6   been shot would be able to play basketball?

 7        A.    Yes.

 8        Q.    Okay.

 9        A.    Let me just -- I'm sorry.

10             What I was going to say was just,

11   you said a person who had been shot -- a person who

12   had been shot, such as Mr. Banister, and the

13   injuries that Mr. Banister suffered.  In my

14   opinion, it's not unexpected that he would be able

15   to play basketball a year and a half later.

16        Q.    And I just wanted to point out on

17   page 12 of the medical record, there's a stamp on

18   here that says, Code Yellow.

19             Do you know what that means?

20        A.    Yes.  Code yellow is just the code in

21   the hospital for a trauma.  They have color codes

22   for all types of different things.  For instance,

23   code blue is cardiac arrest.  Code pink would be

24   abduction of an infant.  Code gray was security.

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 106

1    Code black was weather.

2            Q.    And code yellow just means trauma.

3            A.    Code yellow just means trauma.

4            Q.    Okay.  And just to clarify then, after

5    that primary survey -- or actually I guess I

6    should say after the secondary survey was done of

7    Mr. Banister, no other treatment was given to

8    Mr. Banister for any of the gunshot wounds other

9    than for that left femur fracture.

10           A.    Well, no.  Again, he had his wounds

11   bandaged --

12           Q.    Okay.  Yeah.

13           A.    -- and treated locally.

14           Q.    After -- yeah.

15           A.    And then also he was given pain

16   medication and tetanus prophylaxis, the tetanus

17   shot that we talked about.

18           Q.    Okay.  So he was bandaged and treated

19   locally.

20           A.    His wounds were treated locally,

21   correct.

22           Q.    What does that mean?

23           A.    Well, just that he didn't require

24   anything further than just local dressings to the

Page 107

1    wounds themselves, other than the surgery for the

2    broken femur on the left side.

3        Q.    Okay.  So his gunshot wounds were

4    bandaged.  He was given pain medication for any

5    pain he suffered.

6        A.    Yes.

7        Q.    And that's the extent of the treatment

8    he got for his gunshot wounds except for the left

9    femur fracture.

10       A.    Yes.  I mean, the left femur -- and

11   again, in addition to the -- he ultimately had the

12   surgery on his left thighbone.

13             In the emergency room, we placed him

14   in sort of what's a half a cast, what's called a

15   "posterior mold," just to stabilize the bone so it

16   wouldn't be moving about and creating more pain.

17       MS. BRUCE:  All right.  That's all I have.

18                 FURTHER EXAMINATION

19   BY MS. SMITH:

20       Q.    I just have a couple more question.

21             You're aware of the fact that he was

22   transferred to Cermak Hospital after he left Christ

23   Hospital.

24       A.    Yes.

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 108

1          Q.     Okay.  But he wasn't an outpatient.

2     He was admitted someplace else; is that your

3     estimation?

4          A.     Yeah, I guess that -- yes, he was -- I

5     don't know if Cermak is truly -- it's not an acute

6     care hospital, but it's not -- it's certainly not

7     home.

8          Q.     Right.  Or certainly not the Cook

9     County Correctional Facility.

10         A.     And it's not the correctional facility.

11                And again, it's my understanding

12    that people in custody who are not well enough to

13    be within the general population because of medical

14    reasons, Cermak is where -- in Cook County, that is

15    where they place patients.

16         Q.     Okay.  And on Exhibit 3, you were asked

17    to look at that, the document that was from Cermak

18    Hospital.

19         A.     Yes.

20         Q.     Do you see an indication on there that

21    he was experiencing pain, I think, 5 out of 10?

22         A.     Yes.  In the History and Complaints it

23    says, Pain scale 4 to 5 out of 10.

24                And then under Subjective, about the

Page 109

1    middle of the page, underneath the vital signs it

2    says, As above complaining of pain mostly in the

3    right scapular region.

4         MS. SMITH:   Okay.  I have nothing further

5    then.

6                    FURTHER EXAMINATION

7    BY MS. BRUCE:

8         Q.    I have to just follow up with that?

9              The notes here that he was having a

10   pain scale of 4 to 5 out of 10, based on your

11   review of this record, that was because another

12   inmate hit him and he fell back onto the floor and

13   hurt himself.  That wasn't pain he was still

14   suffering as a result of being shot on January 13th

15   of 2006.

16        A.    I have no way to know what his pain

17   was related to, directly from the injury that he

18   suffered on 8/18/07 or if he still had some pain

19   from the original injuries.

20        Q.    Okay.  Fair enough.

21              And as far as your understanding of

22   what happens with a patient when they are in police

23   custody, to the best of your knowledge, when they

24   have injuries and they're not well enough to be in

Deposition of DON ROSS FISHMAN, M.D., 5/20/2009

Page 110

1    the general population, they're sent to Cermak.

2        A.    That's either -- well, depending on how

3    severely injured you are.  For instance, if they

4    still require inpatient care, then we would

5    transfer -- Christ Hospital would transfer those

6    patients to Cook County Hospital if County had

7    availability of a bed for them, if they're still

8    that ill.  If they were not ill enough to be in an

9    acute inpatient setting but they still needed some

10   medical care, then for Cook County, Cermak was

11   where we would transfer those patients or where the

12   County Sheriffs would take those patients.

13       Q.    Okay.  All right.  And so is that a

14   decision you make or is that a decision Cook County

15   makes, as far as if they're going to go to Cook

16   County Hospital or Cermak?

17       A.    I believe it's actually determined by

18   the County Sheriff.

19       Q.    Okay.

20       A.    Because from -- in Mr. Banister's case,

21   from Christ Hospital's standpoint -- the trauma

22   service of Christ Hospital, if Mr. Banister had not

23   been in custody, he would have gone home.  So he

24   wouldn't need to be in any kind of medical care

Page 111

1    facility.

2         MS. BRUCE:  Okay.  All right.  Thank you.

3              Anything else?

4         MS. SMITH:  No.

5         MS. BRUCE:  Would you like to reserve your

6    signature or waive your signature?

7         THE WITNESS:  I've waive signature.

8         MS. BRUCE:  Oh, I'm sorry, one last thing.

9              Just for the record, you've been

10   referring to your criminal testimony from the

11   criminal case in May of 2008.  I want to mark that

12   as Exhibit No. 4.

13                    (Deposition Exhibit No. 4,

14                     Witness Fishman, was marked for

15                     identification 5/20/09.)

16            FURTHER DEPONENT SAITH NOT ...

17

18

19

20

21

22

23

24

**Exhibit 3**



# MIDWEST ORTHOPAEDIC CONSULTANTS, S.C.

Anton J. Fakhouri, M.D., F.A.C.S., F.I.C.S.
Jose R. Perez-Sanz, M.D.
Luis J. Redondo, M.D., F.A.C.S.
Richard D. Lim, M.D.
Daniel A. Troy, M.D.
George Branovacki, M.D.
Beverlee Brisbin, M.D.

Sung-Lana Kim, M.D.
Monif M. Matouk, D.P.M.
Jeremy T. Bell, PA-C
William C.A. Hall, PA-C
Michael J. Meeker, PA-C
Dana L. Murphy, PA-C

10719 W. 160th Street
Orland Park, Illinois 60467
Fax: (708) 226-3500

708-226-3300

10330 South Roberts Road
Palos Hills, Illinois 60465
Fax: (708) 226-3500

---

## DISCLOSURE FOR EXPERT TESTIMONY

June 11, 2009

TO WHOM IT MAY CONCERN:

This is Dr. George Branovacki, an orthopaedic surgeon, giving my disclosures for expert testimony.

I have been asked to give a list of six things under the Federal Guidelines of Disclosure for Expert Testimony in this written report and I will address each one, one at a time.

1. *A complete statement of all the opinions the witness will express and the basis and reasons for them.* Please refer to my recent clinic note and separate statement on this issue.

2. *The data or other information considered by the witness in forming them.* Please refer to my clinic note and recent letter.

3. *Any exhibits that will be used to summarize or support them.* My exhibits would be x-rays taken at the time of the patient's treatment and any clinic notes and operative reports therein.

4. *The witness's qualifications, including a list of all publications authored in the previous 10 years.* As to my qualifications, I am a Board Certified orthopaedic surgeon. Please refer to my CV for a list of my publications.

5. *A list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition.* I have never been a witness prior to this.

6. *A statement of the compensation to be paid for the study and testimony in the case.* My hourly rate for depositions is $1,000 per hour. My average workday is 10 hours and therefore a half work day for me would be approximately $5,000 for testifying. A full workday would be $10,000.

I hope this answers all the pertinent questions for my disclosure of expert testimony.

Sincerely,

George Branovacki, M.D.
GB/jmm



# MIDWEST ORTHOPAEDIC CONSULTANTS, S.C.

Anton J. Fakhouri, M.D., F.A.C.S., F.I.C.S.
Jose R. Perez-Sanz, M.D.
Luis J. Redondo, M.D., F.A.C.S.
Richard D. Lim, M.D.
Daniel A. Troy, M.D.
George Branovacki, M.D.
Beverlee Brisbin, M.D.

Sung-Lana Kim, M.D.
Monif M. Matouk, D.P.M.
Jeremy T. Bell, PA-C
William C.A. Hall, PA-C
Michael J. Meeker, PA-C
Dana L. Murphy, PA-C

10719 W. 160th Street
Orland Park, Illinois 60467
Fax: (708) 226-3500

708-226-3300

10330 South Roberts Road
Palos Hills, Illinois 60465
Fax: (708) 226-3500

June 9, 2009

TO WHOM IT MAY CONCERN:

RE:    TROY BANISTER

I was asked to evaluate the case and condition of my patient, Troy Banister, and this is my report.

I saw Mr. Banister on June 4, 2009 for the first time in three and a half years status post left femur fracture IM nail following a gunshot wound.  Please refer to my clinic note for the exact clinical status and physical examination.  I will go over his history as far as I understand it from discussion with the patient and speak to his diagnosis and prognosis.

Mr. Banister was shot approximately 10 times on January 13, 2006 by an undercover police officer.  He was shot in the right shoulder, under the right arm and the right leg twice, four times in the left leg and once in the buttock which adds up to 9 bullets but the patient said he had 10 shots that hit him.  The worst injury that he suffered was his left femur which suffered a comminuted shattered femur fracture at the mid shaft.  The femur essentially exploded and I performed an urgent intramedullary nailing on the patient that same day as his injury.  This was done percutaneously through a small incision by his hip.  The fracture was not disturbed.  It was manipulated with closed reduction to realign the fracture and the fracture was stabilized.  He was in the hospital for approximately two days postoperatively and was discharged and sent to Cermak Hospital and then ended up in Cook County Stroger Hospital for treatment afterwards.  He had several x-rays and examination there and had minimal therapy.  Over the next six months he ended up with 5-6 physical therapy sessions and he was essentially in a wheelchair for five to six months for most of the time but he could walk he said finally without crutches at about four months but he was very weak so he was wheelchair bound for a long time.  He was incarcerated for about two and a half years.  At his trial he was acquitted of all the charges against him and was found not guilty of breaking the law and currently there is some legal action against the police department for excessive use of force.

Currently the patient suffered from some mild discomfort.  Again please see my clinic note from today as to the findings.  I think his prognosis is good, but not excellent.  He will be able to do most activities but live with residual left hip and knee discomfort and a small limp and be constantly reminded of his injury.  I think he has healed his fracture but

Page 2
June 9, 2009
Troy Banister

has not fully recovered from his trauma and it may be a lifelong reminder of what he went through.

I will answer some questions posed to me at this time.

1. What would my normal postop treatment have been for the patient had he not gone to prison? My postop treatment would have been non-weight bearing for four to six weeks time followed by gradual return to full weight bearing with crutches, aggressive physical therapy to go hip and knee range of motion and quad strengthening, soft tissue mobilization around the gunshot wound area. I would expect maximum improvement in approximately six months after surgery and level of impairment at that time would be remaining. As for the right shoulder, I never really looked at his right shoulder injury. I am not familiar with any structures that were damaged or physical impairment. The patient moved his right shoulder but on exam today I did not get to assess this.

2. What is my opinion on the treatment the patient received postoperatively? I think he had inadequate physical therapy, only five to six sessions over six months, and probably not enough physical therapy after this kind of injury. He was fortunate enough to recover fairly well from the trauma and was left with some mild weakness and chronic discomfort. His strength seems to be adequate.

3. Why was surgery necessary? The patient had an unstable femur fracture which is always treated operatively with intramedullary nailing. To not do this would have led to prolonged bed immobilization which could be complicated by blood clots, pneumonia, infection, pressure sores and he would need essentially to be in traction for all that time and would end up with a femur non-union and malalignment of his leg, limp, and chronic weakness. Intervention was absolutely necessary and is the gold standard for his injury.

4. Asked to describe the surgery in detail. I refer to my operative report. Essentially the patient underwent general anesthesia. On the fracture table we pulled traction on his femur to realign the fragments and provided closed manipulation to reduce the fracture anatomically. We placed a guide wire to the femur intramedullary canal and reamed the bone and placed a long titanium femoral nail and then locked it proximally and distally with locking screws. Afterwards he was sown up and woke up from anesthesia and taken to the recovery room.

5. What was the nature of the fracture? The fracture was severely comminuted and multiple pieces. There was probably at least 10-30 pieces of small bone fragments along with about 10 pieces of bullet fragments in the area.

Page 3
June 9, 2009
Troy Banister

6. I was asked to comment on any potential complications of his leg alignment from the surgery. His leg length and his foot rotation could be affected despite a perfect surgery, as there is some art involved in fixing the femur to its anatomic position. If it is a simple oblique fracture it could be lined up easily and everything is normal, but when it is a shattered and comminuted it is a guessing game as where to rotate the foot and where to place the length of the femur. I believe his leg lengths are fairly equal from when I saw him walking and examined him today and his foot is rotated so he appears not to have any impairment from this potential complication.

7. Does the patient require any further treatment at this time? I would say, no, he does not. He is at maximum improvement and will need to live with his current impairment.

8. Does he have any permanent damage? I think he has some permanent hip abductor weakness and some mild limp. He does have hip and knee discomfort which may become worse after this trauma and femur damage. It can aggravate his lower back and contralateral side as well as the knee requiring further treatment later in life. I do not think he will need hip or knee replacements or back surgery, but he may have chronic conditions in these joints at a later date.

9. How severe were the patient's injuries due to the gunshot wounds? Based on a reasonable degree of medical and surgical certainty, I believe that the patient suffered a significant trauma to his body from 10 gunshot wounds. He is extremely lucky he was not killed. The patient understands this. I had a long talk with him actually today about having this be a life changing event that he will use his experience for good and he has a new leaf on life. He feels lucky and fortunate to be alive. His extremities were damaged but he has overcome most of his injuries and has some residual impairment but nothing he cannot live with and he is going to continue to stay active. Being in prison he has actually gotten very muscular lifting weights and is quite fit overall. I see no need for any further treatment for Mr. Banister. I think the pain he endured from the initial incident has made him tough enough that he can stand some minor pain in his extremities and act as a reminder as to what occurred in his past.

Page 4
June 9, 2009
Troy Banister

If you have any further questions, please do not hesitate to contact me for any further
testimony needed.

Sincerely,


George Branovacki, M.D.
GB/jmm

Dictated but not read

BANISTER, TROY

6-4-09        O.V.   P.H.                    Troy returns today to see me for the first time in three and a half years status post left femur intramedullary nailing for a gunshot wound to the femur. After surgery he was incarcerated and he recently got out of jail a year ago and he is here for follow up. He complains of a mild limp and occasional soreness in his left hip and knee.

PAST MEDICAL HISTORY: Left femur gunshot wound.
PAST SURGICAL HISTORY: Left femur ORIF.
MEDICATIONS: None.
ALLERGIES: None.
SOCIAL HISTORY: Does not smoke or drink. He is unemployed.

HEIGHT:     5'11"              WEIGHT:     200 pounds

EXAMINATION:
        Gait shows mild antalgic gait. He says he has no pain when he walks but he does have a mild lurch and limp. He has mild abductor weakness 4+/5, negative Trendelenburg sign. He has moderate discomfort with hip flexion past 105 degrees with upper thigh and buttock discomfort. He has minimal pain with extremes of hip rotation with the hip flexed. He has normal knee exam. His thigh wounds are healed well.

X-rays reviewed show a completely healed femur fracture with bone fragments and debris present. The fracture alignment is perfect and the femur is straight.

ASSESSMENT AND PLAN: 24-year-old male with history of left femur IM nail for a gunshot wound. It has been three and a half years since the surgery and the fracture is healed without any deformity. He has mild residual deficit of hip abductor weakness and some hip discomfort and knee pain and I think this may get better with time but may be a permanent thing he has to live with. I recommend no further treatment and I will see him back again on a prn basis. Dr. G. Branovacki/jmm

# CURRICULUM VITAE

# GEORGE BRANOVACKI, M.D.

**P.O. Box 11043**
**Chicago, Il 60611-1043**
**312-493-3619**
**George@Branovacki.com**

## PERSONAL INFORMATION:

**Born**        May 7, 1973
              Chicago, Illinois

**Married**     Lisa Chung PharmD

**Languages**   Fluent in Polish
              Conversational French

## EMPLOYMENT:

2005-Present    Orthopaedic Surgeon
              **Midwest Orthopaedic Consultants, S.C.**        Orland Park, IL
              10719 W. 160TH St.
              Orland Park, Ill. 60467

## EDUCATION:

2004 – 2005     **Scripps Clinic**                              La Jolla, CA
              Fellowship in Adult Lower Extremity Reconstruction

1999 – 2004     **University of Illinois at Chicago**           Chicago, IL
              Orthopaedic Surgery Residency Completed June 2004
              Orthopaedic Surgery Board Certified 2007

1995 – 1999     **Northwestern University Medical School**      Chicago, IL
              Doctor of Medicine Degree awarded June 1999
              Graduated with clinical honors in Medicine, Surgery,
                Orthopaedics, Neurology, Anatomy, Medicine
                Sub-internship clerkships

1993            **Nottingham University Medical School**        Nottingham, UK
              Summer externship in Orthopaedics, Emergency Medicine
                & Rheumatology

1991 – 1995     **Northwestern University**                     Evanston, IL

Bachelor of Arts Degree awarded June 1995
Major in biology, concentration in molecular biology
Graduated with honors

1987 – 1991    **Roycemore High School**                    Evanston, IL
High school diploma awarded June 1991
Graduated Valedictorian

## RESEARCH:

2004 – 2006    **Scripps Clinic**                              La Jolla, CA
*Scripps Center for Orthopaedic Research & Education*
Results of 250 Consecutive PFC Sigma Total Knee Arthroplasties.
Minimum 5 year follow-up.  **Branovacki G**, Pulido P, Patil S, Colwell C.

1996 – 2004    **University of Illinois at Chicago**          Chicago, IL
*Department of Orthopaedic Surgery*
Comparison of Various Brands/Manufacturers of USP Number 2
Braided Polyester Sutures.  **Branovacki G**, Goldberg B, Lee C,
Amirouche F. – submitted for publication

Results of Optifix and Richards Modular Cementless Total Hip
Arthroplasty.  Minimum 10-12 year follow-up.  **Branovacki G**, Tansey
J, Goldstein W.

1994 – 1995    **Northwestern University**                    Evanston, IL
*Department of Molecular Biology-   R. Gaber Lab*
Howell L, **Branovacki G**, Gaber RF: Expression of Mammalian
Potassium Channels in S. cerevisiae.

## PUBLICATIONS:

1. **Branovacki G**. Ortho Atlas U.S. Hip Arthroplasty Femoral Implants 1938-2008.
   *Ortho Atlas Publishing, Inc.,* 2008.

2. **Branovacki G**, Hanson M, Cash R, Gonzalez M: Innervation Pattern of the Radial
   Nerve in the Elbow and Forearm. Journal of Hand Surgery – British Volume 23B,
   (2) pp. 167-169, April 1998.

3. Shirali S, Gonzalez M, Hanson M, **Branovacki G**: The Anatomy of the Flexor
   Pollicis Longus Tendon in the Proximal Forearm, and its Relation to the Median and
   Anterior Interosseous Nerves. Journal of Hand Surgery – British Volume 23B, (2) pp.
   170-172, April 1998.

## PRESENTATIONS:

1. **Branovacki G,** Howell L, Gaber RF: Expression of Mammalian Potassium Channels In Saccharomyces cerevisiae. Presented at Northwestern Undergraduate Research Poster Day, Evanston, Illinois. January 1995.

2. **Branovacki G** Hanson M, Cash R, Gonzalez M: Innervation Pattern of the Radial Nerve in the Elbow and Forearm. Presented at Medical Student Research Day, Chicago, Illinois. January 1997.

3. Shirali S, Gonzalez M, Hanson M, **Branovacki G:** The Anatomy of the Flexor Pollicis Longus Tendon in the Proximal Forearm, and its Relation to the Median and Anterior Interosseous Nerves. Presented at American Association for Hand Surgery, Boca Raton, Florida, January 8-11, 1997.

4. **Branovacki G,** Goldberg B, Lee C, Amirouche F.  Comparison of Various Brands/Manufacturers of USP Number 2 Braided Polyester Sutures.  Poster at AAOS, San Francisco, March, 2004.

5. **Branovacki G,** Goldberg B, Lee C, Amirouche F.  Comparison of Various Brands/Manufacturers of USP Number 2 Braided Polyester Sutures.  Poster at 2004 Orthopaedic Research Society, San Francisco, March, 2004.

6. **Branovacki G,** Colwell C, Abraham E, Chung L, Goldstein W.  The Evolution of Hip and Knee Arthroplasty Implants and Their Manufacturers.  Scientific Exhibit at AAOS, Washington D.C., Feb. 2005.

7. **Branovacki G**, Meininger A, Redondo M, Redondo L, Murphy D, Gordon A.  Perioperative Complications in THA Using Pneumatic Broaching for Zewymuller-Type, Square Taper Stems.  Presented at ISTA 2008, Seoul Korea, Oct. 2008.

## LECTURES/DEMONSTRATIONS:

1. **Contemporary Solutions in Joint Replacement Surgery**, Chicago, April 2006. Surgical cadaveric demonstration: *"Minimal Incision Unicompartmental Knee Replacement".*

2. **Hip & Knee Technology Review Seminar**, Chicago, May 2006.  Lecture: *"Hip and Knee Arthroplasty Implant Selection".*

3. **University of Illinois Department of Orthopaedics - Grand Rounds**, Chicago, June 2006.  Lecture: *"The Evolution of Hip and Knee Arthroplasty Implants and Their Manufacturers".*

4. **Northwestern University Department of Orthopaedics - Grand Rounds**, Chicago, July 2006.  Lecture: *"The Evolution of Hip and Knee Arthroplasty Implants and Their Manufacturers".*

5. **Contemporary Solutions in Joint Replacement Surgery**, Orlando, July 2006. Lecture: *"The Evolution of Hip and Knee Arthroplasty Implants and Their Manufacturers."*; Surgical cadaveric demonstration: *"Revision Knee Replacement"*.

6. **Chicago Orthopaedic Trauma Symposium**, Chicago, August 2006. Lecture: *"Cementless Square Taper Hip Stems for Hemiarthroplasty in Displaced Femoral Neck Fractures."*; Surgical demonstration: *"Broaching for Square Taper Stems using the Woodpecker Pneumatic Broaching System"*.

7. **Midwestern University Department of Orthopaedics - Grand Rounds**, Chicago, IL. November 2006. Lecture: *"Advanced Hip and Knee Reconstruction"*.

8. **Fourth Annual Hip and Knee Symposium for Orthopaedic Residents**, Memphis, TN. May 2007. Lecture: *"The Evolution of Hip and Knee Arthroplasty Implants and Their Manufacturers"*. Lecture: *"Is There a Perfect Cementless Hip Stem?"*

9. **Mobile Lab: Total Hip Resurfacing and Revision Total Knee Arthroplasty**, Arlington Heights, IL. June 2006: cadaveric surgical demonstration.

10. **Focus on Excellence – Implant salesperson training seminar,** Arlington Heights IL, July 2007. Lecture: *"Revision Total Knee Arthroplasty Principles"*.

11. **SL Plus Hip Replacement : Manufacturer Representative Training,** Las Vegas, NV. Dec 2007: Lecture: Square Hip Stem Design Rationale & Use

12. **Fifth Annual Hip and Knee Symposium for Orthopaedic Residents**, Memphis, TN. May 2008. Lecture: *"The Evolution of Hip and Knee Arthroplasty Implants and Their Manufacturers"*.

13. **Mobile lab: Total Hip Resurfacing** Minneapolis, MN. May 2008. Lecture: Total hip resurfacing indications & approach". Cadaveric surgical demonstration.


## ORTHOPAEDIC COURSES:

| | | |
|---|---|---|
| Dec. 2000 | **AO Course Principles of Fracture Management** | Davos, Switzerland |
| Aug. 2002 | **Annual Chicago Trauma Symposium** | Chicago, IL |
| Aug. 2002 | **Basics of Joint Arthroplasty** (J&J/Depuy) | Cincinnati, OH |
| Aug. 2003 | **Annual Board Review Resident Symposium** | Chicago, IL |
| Oct. 2003 | **U of Chicago Orthopaedic Pathology Course** | Chicago, IL |
| Nov. 2003 | **AANA Arthroscopy Fall Course** | New Orleans, LA |
| Dec. 2003 | **AO Course Advanced Fracture Course** | Davos, Switzerland |

| May 2004 | **Miller Orthopaedic Board Review Course** | Denver, CO |
| Nov. 2004 | **AAHKS Annual Meeting** | Dallas, TX |
| May 2005 | **Current Concepts in Joint Replacement Meeting** | Las Vegas, NV |
| Oct. 2005 | **Harvard Hip and Knee Arthroplasty Course** | Boston, MA |
| Mar. 2006 | **Oxford Unicompartmental Knee Course** (Biomet) | San Diego, CA |
| Mar. 2006 | **Revision Joint Arthroplasty Course** (Smith-Nephew) | Las Vegas, NV |
| Jan. 2007 | **Birmingham Hip Resurfacing Surgical Course** | Birmingham, UK |
| Sept. 2007 | **Stryker Cormet 2000 Hip Resurfacing Course** | Las Vegas, NV |

American Academy of Orthopaedic Surgeons Annual Meetings
| Feb. 1993 | Washington D.C. |
| Mar. 2002 | New Orleans, LA |
| Feb. 2004 | San Francisco, CA |
| Mar. 2005 | Washington D.C. |
| Feb. 2006 | Chicago, IL |
| Feb. 2007 | San Diego, CA |
| Mar. 2008 | San Francisco, CA |
| Mar. 2009 | Las Vegas, NV |

# CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of September, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:  Julia Suzanne Bruce, ACC, Scott J. Jebson, ACC, 30 N LaSalle St, Ste 1400, Chicago, IL 60604, and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants:  none.

/s/ Kenneth N. Flaxman

_____

Kenneth N. Flaxman
ARDC Number 08830399
200 S Michigan Ave, Ste 1240
Chicago, IL 60604-2430
(312) 427-3200 (phone)
(312) 427-3930 (fax)
knf@kenlaw.com (email)